STEPHENSON V. STATE OF INDIANA.

[No. 25,310. Filed January 19, 1932. Rehearing denied June 27, 1933.]

142

144

*Felix Blankenbaker, Clarence Darrow, Bertram C. Jenkins, James H. Parker, M. Clyde Brown, John H. Kiplinger, Lloyd O. Hill, Thomas V. Miller, Paul Newman* and *Clarence Benadum,* for appellant.

*Arthur L. Gilliom,* Attorney General, *James M. Ogden,* Attorney General, *V. Ed Funk, Harry Taylor, Dale F. Stansbury and Edward J. Lennon, Jr.,* deputy Attorneys General, *William F. Remy, Ralph Kane* and *Charles E. Cox,* for the State.

PER CURIAM.—Appellant, together with Earl Gentry and Earl Klinck, was charged with the crime of homicide by an indictment in four counts returned by the Grand Jury of Marion County, Indiana, which indictment, omitting the formal parts, reads as follows:

"The Grand Jurors of the County of Marion and State of Indiana upon their oaths, present that David C. Stephenson, Earl Gentry and Earl Klinck, on or about the 16th day of April, A. D. 1925, at and in the County of Marion and State aforesaid, did then and there unlawfully, feloniously and with premeditated malice kill and

murder Madge Oberholtzer in the manner and form and by the means following, to wit: That said David C. Stephenson, Earl Gentry and Earl Klinck did then and there on the 16th day of March, 1925, wrongfully, unlawfully and feloniously by force of arms and by duress and by putting her the said Madge Oberholtzer in fear and against her will take possession of the body and person of her, the said Madge Oberholtzer, and did then and there wrongfully, unlawfully and feloniously by force of arms and by duress and by putting her, the said Madge Oberholtzer in fear and against her will place her in a drawing room of a certain pullman passenger car which was then and there a part of a railroad train, which train was then and there scheduled to and did shortly thereafter depart from the city of Indianapolis for a regular trip to the city of Chicago; and said defendants did then and there wrongfully, unlawfully and feloniously, by force of arms and by duress and by putting her, the said Madge Oberholtzer in fear and against her will restrain her of her liberty in the drawing room of said car on said train during the progress of said train to the city of Chicago until the city of Hammond, in the State of Indiana, was reached; and said defendants did unlawfully and feloniously while so holding possession of the body and person of said Madge Oberholtzer, as aforesaid, and so restraining her of her liberty in the drawing room of said car as aforesaid, upon the body and person of her, the said Madge Oberholtzer, commit and assault, and did her, the said Madge Oberholtzer, unlawfully and feloniously in a rude and insolent manner her the said Madge Oberholtzer strike, beat, bite and grievously wound with the unlawful and felonious intent her, the said Madge Oberholtzer, to ravish and carnally known forcibly and against her will; and said defendants when said train arrived at the city of Hammond at about 6 o'clock in the morning of the 17th day of March, 1925, still unlaw-

fully and feloniously, while so holding possession of her the said Madge Oberholtzer and so restraining her of her liberty as aforesaid did cause her to depart from said car of said train and to enter the room of a hotel in said city of Hammond and to occupy a bed with said defendant Stephenson; that thereafter on the said 17th day of March, 1925, in said city of Hammond, the said Madge Oberholtzer, distracted with the pain and shame so inflicted upon her by said defendants as aforesaid, did procure and swallow into her stomach a large quantity of deadly poison, to wit: Bichloride of mercury; that said defendants on said day with full knowledge that she the said Madge Oberholtzer had taken said poison as aforesaid and although requested by her so to do did unlawfully, feloniously and wilfully wholly fail and refuse to procure for or furnish to her the said Madge Oberholtzer any antidote for said poison or any attention or help from any physician or any one skilled in counteracting the effects of said poison although they and each of them were then and there fully able to procure such antidote and the help of such physician; that said defendants did, on the afternoon and night of said March 17th, still unlawfully and feloniously by force of arms and by duress and by putting her the said Madge Oberholtzer in fear holding possession of the body and person of her the said Madge Oberholtzer and restraining her of her liberty, place her in an automobile and by said vehicle did transport her back to the city of Indianapolis and did during said night and until near noon on the 18th day of March so hold possession of her body and person and restrain her of her liberty as aforesaid in a room in a garage of said defendant Stephenson, and did at all times during said return and at all times during the imprisonment of her the said Madge Oberholtzer in said garage unlawfully and feloniously wholly fail and refuse to furnish or provide for or administer to

any antidote for said poison and did unlawfully and feloniously wholly fail and refuse to procure for her or furnish to her any attention by or help from any physician or any one skilled in counteracting the effects of said poison although the said defendants and each of them were then and there fully able to procure such antidote and help for such physician; that thereafter she the said Madge Oberholtzer did at and in the County of Marion aforesaid languish and languishing did thereafter on April 14th, 1925, in said county die from the effects of her wounds inflicted as aforesaid and said poison taken as aforesaid.

"And so the Grand Jurors aforesaid upon their oaths aforesaid do charge and present that said defendants did, by the manner and means aforesaid her the said Madge Oberholtzer unlawfully, feloniously and with premeditated malice kill and murder, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Indiana."

"COUNT TWO

And the Grand Jurors aforesaid, upon their oaths aforesaid do further present and charge that David C. Stephenson, Earl Gentry and Earl Klinck on the 16th day of March, A. D. 1925, at and in the County of Marion and State aforesaid did then and there unlawfully, feloniously and purposely and with premeditated malice kill and murder one Madge Oberholtzer by then and there unlawfully and purposely causing to be administered to the said Madge Oberholtzer by her own hand a certain deadly poison, commonly called bichloride of mercury which the said Madge Oberholtzer acting under fear and duress and the compulsion of said David C. Stephenson, Earl Gentry and Earl Klinck, then and there swallow into her stomach and body by which she then and there thereby died.

"And so the Grand Jurors aforesaid upon their oaths aforesaid do present and charge that David C. Stephenson, Earl Gentry and Earl Klinck did unlawfully, purposely, feloniously and with premeditated malice, in the manner and form and by the means aforesaid, the said Madge Oberholtzer kill and murder contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Indiana.

"COUNT THREE

And the Grand Jury aforesaid upon their oaths do further present and charge that David C. Stephenson, Earl Gentry and Earl Klinck, on the 16th day of March, 1925, at and in the County of Marion and in the State of Indiana, did then and there unlawfully and feloniously make an assault upon the body and person of one Madge Oberholtzer, a woman of the age of twenty-eight years, and her the said Madge Oberholtzer did then and there unlawfully and feloniously touch, beat, strike, bite and wound the body and person of the said Madge Oberholtzer with the unlawful and felonious intent then and there and thereby forcibly and against her will her the said Madge Oberholtzer to ravish and carnally know, from which said assault and from which said touching, biting, striking and wounding and as a result thereof the said Madge Oberholtzer, did then and there sicken, languish and die.

"And so the Grand Jurors aforesaid upon their oaths aforesaid do charge and present that said David C. Stephenson, Earl Gentry and Earl Klinck did unlawfully and feloniously in the manner and form and by the means aforesaid the said Madge Oberholtzer kill and murder, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Indiana.

"COUNT FOUR

The Grand Jurors aforesaid, upon their oaths aforesaid, further present that David C. Stephenson, Earl Gentry and Earl Klinck on or about the 16th day of April, A. D. 1925, at and in the County and State aforesaid, did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder one, Madge Oberholtzer, in the manner following, to-wit: that they the said David C. Stephenson, Earl Gentry, Earl Klinck and each of them did then and there unlawfully, feloniously, wilfully and forcibly take possession of and assume and undertake the custody and control of the body and person of the said Madge Oberholtzer against her will, she the said Madge Oberholtzer being then and there in a weak, sick and helpless condition, and did then and there assault, beat, strike and bite and wound the said Madge Oberholtzer with the unlawful and felonious intent then and there to rape, ravish and carnally know her the said Madge Oberholtzer against her will, that by reason of said assault and wounds aforesaid, the said Madge Oberholtzer was then and there in great distress of mind and body and distracted with pain and grief and did then and there while in the throes of such bodily pain and mental grief and distraction procure and swallow a quantity of poison to wit: bichloride of mercury, that thereupon said Madge Oberholtzer became violently ill and was then and there in need of medical treatment, attention and the services of a physician, such medical services and treatment being then and there necessary to the preservation and prolongation of the life of her, the said Madge Oberholtzer, all of which was then and there well known to the said David C. Stephenson, Earl Gentry and Earl Klinck and each of them, and they and each of them being then and there able to provide such medical attention, services and assistance and she, the

said Madge Oberholtzer being then and there weak, helpless and dependant upon the said David C. Stephenson, Earl Gentry and Earl Klinck for such medical care, treatment and services; that they the said David C. Stephenson, Earl Gentry and Earl Klinck and each of them did then and there unlawfully, feloniously and forcibly imprison, restrain and prevent said Madge Oberholtzer from obtaining such medical assistance and services with the unlawful and felonious intent on the part of each of them to kill and murder the said Madge Oberholtzer; that due to said acts aforesaid, on the part of the defendants aforesaid, and each of them, in preventing her from obtaining such medical attention and preventing from obtaining the services of a physician she the said Madge Oberholtzer then and there languished and afterward to wit: on the 14th day of April A. D. 1925, she, the said Madge Oberholtzer, then and there and thereby died from the effects of said poison aforesaid, and so the Grand Jurors aforesaid, upon their oaths aforesaid do say and charge that said David C. Stephenson, Earl Gentry and Earl Klinck in manner and form aforesaid, did kill and murder said Madge Oberholtzer, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Indiana." Gentry and Klinck were acquitted.

The trial court sustained a demurrer to appellant's plea in abatement, overruled his motion to strike out parts of count one and four, and to quash the indictment, to all of which rulings proper exceptions were reserved. Appellant entered a plea of not guilty, and filed his motion for a change of venue from the county, which motion was sustained by the court and the cause was sent to Hamilton county for trial. Appellant there filed a motion to be let to bail, and to require the state to elect upon which count of the indictment it would go

to trial. Each of said motions were overruled and exceptions saved. During the trial appellant twice moved to have the court set aside the submission of said cause and discharge the jury, and at the conclusion of the State's evidence moved for an instructed verdict in his favor, which motions the court overruled.

The court instructed the jury in writing, giving fifty-seven instruction, twelve of which were tendered by appellant, and twenty-seven given by the court of his own motion, over the objections of appellant.

The jury returned a verdict finding appellant "guilty of murder in the second degree as charged in the first count of the indictment" and fixing his punishment at life imprisonment, on which verdict judgment was entered on November 16th, 1925.

Appellant filed a motion to set aside and vacate the judgment; that he be held in the Hamilton County jail pending the preparation and filing of his motion for a new trial; motion in arrest of judgment, motion for a new trial, each of which was overruled by the court.

Appellant, by his first, second, third, and fourth assignment of errors, presents the question of whether the Hamilton Circuit Court acquired jurisdiction over the person of the defendant, over the subject-matter of the action, to try said cause and pronounce judgment thereon. Appellant's only reason for this contention is because the transcript of the proceedings in the Marion Circuit Court was not signed by the clerk of the Marion Circuit Court. Appellant says that the omission of the signature of the clerk is fatal and that there never was a legal transcript of the proceeding in the Marion Circuit Court filed with the clerk of the Hamilton Circuit Court, and cites in support thereof sects. 2239, 2240, 11846, Burns 1926, and *Fawcett* v. *State* (1880), 71 Ind. 590.

Section 2239, *supra,* provides that: "When affidavits

for a change of venue are founded upon excitement or prejudice in the county against the defendant, the court, in all cases  . . .  punishable by death, shall grant a change of venue to the most convenient county.  The clerk must thereupon immediately make a transcript of the proceedings and orders of the court, and, having sealed up the same with the original papers, shall deliver them to the sheriff, who must, without delay, deposit them in the clerk's office of the proper county, and make his return accordingly.  . . ."  Sec. 2240, *supra,* provides that: "The jurisdiction of the court to which the change of venue is granted shall be complete, and the cause must be docketed and stand for trial at the first term thereafter; and such court shall take cognizance of such cause and proceed thereon to trial, judgment and execution in all respects as if the indictment therein had been found and returned by the grand jury impaneled in such court,  . . ."  The appellant, as stated above, does not contend that the procedure set out in the latter part of §2239, *supra,* was not followed. It will be observed that neither §2239 nor §2240 expressly requires the transcript to be certified, but only requires the clerk to make a transcript, which means a copy.  Webster defines the word transcript as "that which has been transcribed; a copy of any kind." Worcester says it is a "writing made from or after an original; a copy."  Burill defines it as "a copy, particularly of a record."  Bouvier, as "a copy of an original writing or deed."  Our own court defined the word transcript in the case of *Mitchell et al.* v. *Beissenherz* (1922), 192 Ind. 587, 135 N. E. 885, as follows:  "A transcript is what the name implies, a copy."  The Supreme Court of Nebraska, in *State* v. *Board, etc.,* 7 Nev. 83, 95, said: "The word 'transcript' suggests the idea of an original writing.  The word, not only in its popular but legal sense, means a copy of something al-

ready reduced to writing." Then was there, in fact, a transcript made by the clerk of Marion County, sealed up with the original paper, delivered to the sheriff who in turn deposited them in the office of the clerk of the Hamilton Circuit Court. This is the only requirement of the two sections above. But appellant says that §11846, *supra,* is applicable here and calls our attention to *Fawcett* v. *State, supra,* which holds that the certificate of the clerk, signed and sealed is necessary to the legality of the transcript and without it there is legally no transcript. Sec. 11846, *supra,* reads as follows, "In all cases where a complete record is dispensed with, the production of the papers and entries relating thereto, and all transcripts thereof, certified and attested with the seal of such court as complete copies of all the papers and entries of such case, shall have the same force in evidence as a transcript of a complete record thereof." The Fawcett case holds that the last above quoted section of the statute is applicable in a change of venue case, and requires the transcript thereof to be signed by the clerk to which reasoning we can not agree. We are of the opinion that §11846, *supra,* has no application to a case of this kind and was never intended by the legislature to require the clerk of the circuit court to certify to a transcript on change of venue. Therefore, insofar as the case of *Fawcett* v. *State, supra,* conflicts with the views herein expressed, the same should be and is hereby overruled. We are further strengthened in our view of the above statutes for we find that the legislature when they required a transcript to be certified they used appropriate language to that effect. Section 1946, Burns 1926, governing appeals from the justice of the peace to the circuit court, expressly provides that the justice shall make out and *certify* a complete transcript, etc., also §716, Burns 1926, which has to do with transcripts on appeal

to this court, expressly provides that the transcript shall be *certified* and sealed by the clerk. We find no such provision in the statute governing the procedure in changes of venue cases. We do not desire to be understood by what we have said as discouraging the .practice which has been very general in this state, of the clerk of the circuit court certifying to transcripts on change of venue, as we feel this is very good practice, but we can not agree that the failure of the clerk to affix his signature to the certificate is essential to the legality of the transcript, where all the requirements of the statute has been satisfied.

Appellant's fifth assignment of error relates to the action of the court in sustaining appellee's demurrer to his plea in abatement. Appellant alleges in his plea in abatement that there was no legal evidence before the grand jury on which it could return an indictment. This question was decided adversely to appellant's contention in the case of *Pointer* v. *State* (1883), 89 Ind. 255, in which case the following language was used: "The question attempted to be presented by. the first and second causes for a new trial could therefore only have been presented by pleading them in abatement and by pleading them in bar, all matters in abatement were waived. . . . It is, nevertheless, no ground for a plea in abatement, that the indictment was found without evidence, or without sufficient evidence, or that no vote was taken by the grand jury on the indictment." See 31 C. J. 586, §50, *Guy* v. *State* (1906), 37 Ind. App. 691, 77 N. E. 855.

Appellant's sixth and seventh assignments of error relate to the overruling of his motion to strike out parts of count one of the indictment, particularly the latter part thereof which relates the happenings subsequent to the taking of poison by Miss Oberholtzer and which charged that appellant failed to pro-

vide medical aid. A motion to strike out parts of an indictment is not provided for by our code of criminal procedure, yet this court has recognized such procedure for the purpose of removing from an indictment such allegations as serve only to prejudice the court or jury against the defendant, without aiding or contributing to the statement of the offense charged.

This count of the indictment charges the whole criminal program as one transaction. If we assume the facts to be that the appellant is criminally chargeable with the taking of the poison by Miss Oberholtzer, and that the wound inflicted in the assault and battery with intent to rape, plus the effects of the poison, plus the unlawful imprisonment and failure to render aid and assistance, set out in the latter part of the count, caused the death, and that she would not have died in the absence of the wound, or the poison, or the unlawful imprisonment, or failure to give aid, all of which were unlawful and criminal, then we have a state of facts which makes the latter part of the first count a necessary allegation, and one without which the jury could not have found the appellant guilty under the first count or any of the other counts in the indictment, notwithstanding they might believe he was guilty of acts which would justify a conviction of murder under proper allegations.

The first count charges that death resulted from the effects of the wound and the poison. It is obvious that death would not have resulted from the imprisonment and failure to give aid alleged, since such imprisonment and failure to give aid was only injurious to the extent that it contributed to and aggravated the results of the wound and the poison; and it is equally obvious that death might not have resulted in the absence of the imprisonment and failure to give aid, and the jury might readily have believed, notwithstanding the crim-

inal responsibility of the appellant for the wound and the poison, that death would not have ensued except for the imprisonment and failure to give aid.

We are not concerned with the question of whether the wound or the poison was the proximate cause of death, since the first count charges that the appellant was responsible for all of the wrongs. If each contributed, the extent to which they influenced her death is immaterial. If one person had been responsible for the wound, and another had been responsible for the poison, and still another for the imprisonment and failure to give aid, the first two having no cause to anticipate the latter, it would be highly important to determine which was the proximate cause of the death, but since one person was responsible for all, the influence of either in bringing about the result is immaterial if the result was produced by the combined influence of all.

The instructions of the court, insofar as they effect the first count of the indictment, are consistent with this theory. Under this theory, the defendant Klinck would be guilty of homicide under the first count of the indictment if he aided and abetted the appellant by assuming and undertaking the imprisonment in the Stephenson garage after the return from Hammond. He would be liable as an accomplice and not as an accessory. For, where one contributes to a particular result by his unlawful act, he is held responsible as though he alone had produced it.

Appellant's eighth and ninth assignments of error question the ruling of the court on his motion to quash the first count of the indictment. Appellant's motion to quash states the statutory grounds, (a) that the facts stated in count one do not constitute a public offense; (b) that count one does not state the offense with sufficient certainty. Appellant states that the law requires the facts and circumstances

constituting the offense to be stated in plain and concise language; also that it must be shown by proper allegations that the alleged act or acts of the accused was the proximate cause of the death as distinguished from the cause of a condition affording an opportunity for the compassing of death by some other unconnected agency. It is contended by appellant in his brief that the indictment is fatally defective for he says the facts show that an independent supervening cause of death is given, it being alleged that deceased voluntarily procured and swallowed a large quantity of deadly poison, and this is given as one of the joint causes of death. Then appellant urges that it is the law that when wounds are inflicted by one person on another, which wounds are not within themselves fatal, and a supervening cause intervenes, such supervening cause not being at the direction, request or connivance of the one inflicting the wounds, and that but for such supervening cause death would not have resulted, the infliction of the wounds is not the proximate cause of death, but the supervening cause is the proximate cause, and the one responsible for the death. We readily agree with appellant's statement of the law, and in the cases of *Bush* v. *Commonwealth* (1880), 78 Ky. 268; *Rigsby* v. *State* (1910), 174 Ind. 284, 91 N. E. 925; *Kelley* v. *State* (1876), 53 Ind. 311, and other cases cited by appellant, we think the above rules were correctly and properly applied. So if it be true, as appellant contends, that the indictment alleges that Madge Oberholtzer voluntarily committed suicide, that is that she took her own life while in sound mind, such an act on her part would constitute an intervening responsible agent, such as would break the causal connection between the acts of appellant and the death of Madge Oberholtzer. But we can not agree with appellant in this construction of the first count of the indictment, for it is alleged in said count, in effect, that

Madge Oberholtzer was at the time she swallowed the poison, distracted with the pain and shame inflicted upon her by appellant. If the allegations be true, and we must so consider them on a motion to quash, then the act of Madge Oberholtzer in taking the poison was not the act of a responsible agent, and the chain of cause and effect between the acts of appellant and the death would not be broken, and appellant would be guilty of murder, provided, the alleged irresponsible mental condition of Madge Oberholtzer could be said to be the natural and probable result of the alleged treatment by appellant. Whether or not the alleged treatment accorded Madge Oberholtzer by appellant would naturally and probably result in rendering her distracted, and mentally irresponsible was a question of fact for the jury. We think the facts and circumstances alleged and set out in the indictment were sufficient, if proven, to justify a finding of guilty by the jury. *Regina* v. *Pitts* (1842), Car. & Mar. Rep. 284, 174 English Rep. 509; *Rex* v. *Beech* (1912), 23 Cox Crim. L. Cases 181; *Wilder* v. *Russell Library Co.* (1927), 107 Conn. 56, 139 Atl. 644, 56 A. L. R. 455; Wharton on Homic. §374; Wharton Crim. Law, 10th Ed. §167.

Appellant contends that said first count is defective in that it nowhere charges the appellant with the purpose to kill Madge Oberholtzer. This allegation, we think is not necessary where it is alleged that life is taken in the commission of a felony, such as attempted rape, as is charged in the first count of the indictment, §2412, Burns 1926; *Moynihan* v. *State* (1880), 70 Ind. 126, 36 Am. Rep. 178; *Cole* v. *State* (1922), 192 Ind. 29, 134 N. E. 867. The sufficiency or insufficiency of an indictment may be tested by the answer to the following question: "Can the facts properly alleged be true, and the defendant innocent of the offense charged against him?" If the answer must be in the affirmative, the indictment is bad; if in the

negative the indictment is good. *State* v. *Hilgendorf* (1899), 23 Ind. App. 207, 55 N. E. 102. An indictment which charges a public offense with reasonable certainty is good although the offense may not be charged with strict formality, and there may be surplusage in the indictment. *Hobbs* v. *State* (1893), 133 Ind. 404, 32 N. E. 1019, 18 A. L. R. 774; *State* v. *White* (1891), 129 Ind. 153, 28 N. E. 425; *Fisher* v. *State* (1891), 2 Ind. App. 365, 28 N. E. 565; *State* v. *McDonald* (1886), 106 Ind. 233, 6 N. E. 607; *Myers* v. *State* (1885), 101 Ind. 379. Defects that do not affect the substantial rights of the defendant are not sufficient to require the quashing of an indictment or information. *Billings* v. *State* (1886), 107 Ind. 54, 6 N. E. 914, 7 N. E. 763, 57 Am. Rep. 77; *Woodward* v. *State* (1885), 103 Ind. 127, 2 N. E. 321. An indictment that fairly informs the accused of the offense charged against him and enables the court to pronounce judgment according to the right of the case is sufficient. *Woodward* v. *State, supra; State* v. *Shaw* (1892), 22 Ore. 287, 29 Pac. 1028. Under the code of criminal procedure in this state no more certainty is required in criminal than in civil pleading; all that is required is that the averments be certain to a common intent. *Meiers* v. *State* (1877), 56 Ind. 336, 342; *McCool* v. *State* (1864), 23 Ind. 127, 129; *State* v. *Jenkins* (1889), 120 Ind. 268, 269, 22 N. E. 133; *State* v. *Hopper* (1892), 133 Ind. 460, 464, 32 N. E. 878; Gillett's Criminal Law (2nd Ed.) Sec. 125. Testing the first count of the indictment in this case by the rules above stated we are forced to the conclusion that the indictment is good..

Appellant next urges that the court below erred in not requiring the state to elect on which count it would go to trial. Where an indictment contains several counts, each charging the murder of the same person, but in a different manner, the state

can not be compelled to elect between such counts. *Merrick* v. *State* (1878), 63 Ind. 327.

In his motion in arrest of judgment appellant urges the same reasons that he urged in his motion to quash, and we need say nothing further on this question.

Appellant contends that the trial court erred in not permitting him to remain in the Hamilton County jail pending the preparation and filing of his motion for a new trial. The statutes, §§2358-2359, Burns 1926, provide that the clerk after the conviction and sentence must without delay certify a copy of the judgment to the sheriff and the sheriff must within five days convey the convict to the prison. It is true that this court, in *Ex Parte Huffman* (1914), 181 Ind. 211, 104 N. E. 511, held that under Art. 1 §13 Const., §65, Burns 1926, the right of an accused "to be heard by himself" continues until the disposition of a motion for a new trial and that "the trial court would not be warranted in ordering the sheriff to take the petitioner to the state prison pending the determination of his motion for a new trial." But in the case at bar the court on its own motion ordered the appellant returned to Hamilton County on December 12, when his motion for a new trial and other motions were filed and ruled upon. No showing is made that appellant's constitutional right to be heard was in any way infringed or that he or his counsel were prevented from preparing a proper and complete motion for a new trial. On the contrary, the motion appears to be longer and more involved than it needed to be. The procedure that was had in this case, in this regard may have been necessary in the opinion of the court, either for the protection of the prisoner or to secure the state from his possible escape. No reversible error appears from the record on this question.

Appellant objected to certain testimony of Dr. John

K. Kingsbury. After stating his name, residence, age, etc., he stated that he was called by telephone about 11:30 A. M. March 17, and went immediately to the Oberholtzer home, and there found Madge Oberholtzer lying on a bed in a state of shock, pale, body cold, rapid pulse, that her clothing was disheveled, her dress open in front exposing bruises on her chest; that he made a superficial examination through her clothing to determine possible broken bones (having been informed that she had been in an automobile accident). He was then asked, if in the course of his examination, she said anything in reference to whether or not she expected to die, and what it was. He answered (over the objections of appellant) that, "She said that she didn't expect to get well; didn't want to get well; that she wanted to die." He was then asked, "Now doctor, just detail any conversation which you may have had with her concerning her condition?" He then again related his superficial examination, and pressed her for an answer as to how it happened. At this point appellant interposed an objection on the ground that it had not been shown that the deceased was in extremis, or that she thought that she was going to die soon, which objection was overruled. The doctor then proceeded to relate in answer to the question a narration, as told to him by Miss Oberholtzer, of all the events occuring from the time she left home until she returned. This narration was in substance the same as the written declaration of Miss Madge Oberholtzer, which will in substance hereinafter be set out. Mrs. Eunice Schultz, who was a roomer at the Oberholtzer home, had previously testified, that, the man who brought Madge home told her that "She was hurt in an automobile accident . . . he did not think any bones were broken." That she saw the bruises on various parts of Madge's body which she described. That "her

clothing was mussed up and she was very dirty . . . ,
that she looked very white around the mouth and
groaned" and that Madge said to her, "Oh Mrs. Schultz,
I am dying." The rule of law governing the admission
in evidence of unsworn statements as dying declarations
is very clearly and definitely settled in Indiana and ap-
pellant has set it out very fully and concisely in his
brief. See *McKee* v. *State* (1926), 198 Ind. 590, 154 N.
E. 372; 21 Cyc. 976, 977; *Watson* v. *State* (1878), 63
Ind. 548; *Morgan* v. *State* (1869), 31 Ind. 193; *Jones* v.
*State* (1880), 71 Ind. 66.

The trial court had, not only the statements of Miss
Oberholtzer that she was dying, and that she could not
get well, but the conduct, manner, symptoms and condi-
tion of Miss Oberholtzer at the time she made the state-
ments were detailed to the court. It was said in the case
of *Williams* v. *State* (1925), 196 Ind. 84, 88, 147 N. E.
153, that, "The competency of this evidence (meaning
dying declaration) was a question for the trial court to
be determined by the proof relative to the declarant's
state of mind at the time he made the declarations. The
proof preceding the admission of such declarations must
convince the trial judge that they were uttered under
a sense of impending death without hope of recovery,
or that the declarant fully believed that death was so
near that all motives to falsehood were superseded by
the strongest motives to strict veracity. . . . Proof
of the facts thus to be settled by the judge is not limited
to the declarant's statements alone, "but it may be
inferred from the general statements, conduct, manner,
symptoms and condition of the declarant, which flow as
the reasonable and natural results from the extent and
character of his wound, or the state of his illness." In
the case of *Hill* v. *State* (1924), 194 Ind. 688, 141 N. E.
639, the court said: "The admissibility of these state-
ments was first for the trial court to determine, and that

decision will not be disturbed unless it is manifest that the facts did not warrant such ruling," *Gipe* v. *State* (1905), 165 Ind. 433, 75 N. E. 881, 1 L. R. A. (N. S.) 419, 112 Am. St. Rep. 238. We can not say that the admission of Dr. Kingsbury's testimony was manifestly erroneous.

Appellant's points 9, 10, 11, 12, 13, 14 and 15, relate to admission of evidence over his objections. We have examined each of these objections, and find that they either relate to portions of what was admitted in evidence as a dying declaration, or evidence relating to the crime charged in count four of the indictment, on which appellant was acquitted. We find no reversible error in any of the court's rulings under these points. Appellant's points 17 to 43, inclusive, also relate to the court's rulings in the admission or rejection of certain evidence. Most of these objections are very technical, or relate to counts other than count one under which appellant was convicted. We find no reversible error in the action taken by the court and we are of the opinion that appellant suffered no substantial injury thereby.

Appellant's 16th point is based upon his motion to withdraw the submission and discharge the jury on account of certain remarks made by the trial judge in ruling upon the admissibility in evidence, of a conversation had between the witness and his daughter (the deceased) out of the presence of appellant, which conversation was sought to be introduced as a dying declaration. The appellant interposed an objection to the question put by the state, "Now Mr. Oberholtzer, at that time, I wish you would tell the jury what she told you happened on this trip" for the reason that it was not shown that Madge Oberholtzer at the time labored under the belief that there was to be immediate dissolution, nor that she believed that her end was near, etc., and also that, dying declarations are not

competent in case of suicide.   The remarks of the court objected to, was addressed to the last part of the objection and was a statement of the law as the court understood it, when dying declarations were admissable, when the defendant made the contention that the deceased committed suicide, and the remarks of the court were meant to answer appellant's contention that Madge Oberholtzer committed suicide and therefore the evidence was not admissable.   We are persuaded that the jury fully understood that the court was ruling on the admissibility of evidence and not instructing them in the law, which they should apply when deliberating upon the guilt or innocence of appellant in the jury room after the case was finally submitted to them.   We can not say that we approve of the practice generally of either arguments by counsel on questions of the admissibility of evidence or of the court discussing the law, relating thereto.   We think it better practice, that the court have the jury retire during the discussion and ruling.

Appellant by his motion for a new trial challenges the verdict raises the same question as he did in his motion to quash.   We have heretofore set out our views on these questions and we need not say anything further on this subject.

Appellant by his motion for a new trial challenge the sufficiency of the evidence to support the verdict and this question necessitates a statement of the facts proven at the trial.   In substance they are as follows:

The victim of this homicide is Miss Madge Oberholtzer, who was a resident of the City of Indianapolis and lived with her father and mother at 5802 University Avenue, Irvington.   She was twenty-eight years of age; weighed about 140 pounds and had always been in good health; was educated in the public primary and high

school and Butler college. Just prior to the time of the commission of the alleged acts in the indictment of appellant upon her, she was employed by the State Superintendent of Public Instruction as manager of the Young Peoples' Reading Circle.

Miss Oberholtzer was introduced to appellant by her escort at a banquet in the City of Indianapolis, January 12th, 1925. This introduction was their first meeting.

Appellant resided at ―― ――― Street, Irvington, City of Indianapolis, at the time of the beginning of the actions disclosed by the evidence. His home was but a short distance, some two or three city blocks, from the home of the Oberholtzers. After the meeting of appellant and Miss Oberholtzer at the banquet, he invited her several times for a "date." She gave him no definite answer. She later consented to his insistant invitation to take dinner with him at a hotel in Indianapolis, and, upon the occasion, he came to her home for her with his automobile and they dined together. Thereafter, appellant called her several times by telephone, and once again she had dinner with him at the same hotel, at which another person was a third member of the party. Subsequent to the second dinner, Miss Oberholtzer was at Stephenson's home at a party with several prominent people, where both ladies and gentlemen were guests. The two principal actors to this tragedy did not see each other again until late Sunday evening, March 15th, 1925. The afternoon of that Sunday, she had been away from home and returned between nine and ten o'clock in the evening. Upon her return, her mother, Mrs. Matilda Oberholtzer, informed her that a telephone message came for her, which the mother delivered to her daughter, which was a piece of paper upon which there was the telephone number Irvington 0492. Miss Oberholtzer called the number and Stephenson answered the call. He asked her to come to his home for he

wished to see her about something very important to herself and that he was leaving for Chicago and it was necessary that he see her before he departed. In the telephone conversation, Stephenson said to Miss Oberholtzer that he could not leave, but that he would send someone for her. Very soon thereafter, a Mr. Gentry, whom Miss Oberholtzer had never seen, came for her and said he was from Stephensons. She walked with Gentry to Stephenson's home. When they arrived, they went inside the home and there saw Stephenson. He had been drinking. Stephenson's chauffeur, whom he called "Shorty," was there also. As soon as she got inside the house, she grew very much afraid when she learned that there was no other woman about and that Stephenson's housekeeper was away, or at least not to be seen. Immediately upon her arrival at Stephenson's home, he, with the other men, took her into the kitchen and some kind of drinks were produced. At this time another man by the name of Klinck came in by the back door. She said she did not want to drink, but Stephenson and the other men forced her to drink and she submitted because she was afraid to refuse, and drank three small glasses of the liquor produced. The drinks made her very ill and dazed and the effects of them caused her to vomit. Stephenson then said to her, "I want you to go to Chicago with me." She said she couldn't and would not; and that she was much terrified and did not know what to do and said that she wanted to go home. Stephenson replied to her, "No, you can not go home. Oh yes! you are going with me to Chicago. I love you more than any woman I have ever known." She then tried to call her home by telephone, but could get no answer. Later, when she again tried to get to the telephone, they prevented her from so doing.

The men then took her up to Stephenson's room and Stephenson opened a dresser drawer, which was filled

with revolvers. He told each of the men to take one and he selected a pearl handled revolver and had "Shorty" load it. Stephenson then said first to her that they were going to drive through to Chicago. She told him that she would not go. Then Gentry called a hotel in Indianapolis, at Stephenson's order, and secured reservations in a drawing room for two persons. [Then all of the men took her to the automobile at the rear of Stephensons's yard and they started the trip. She thought they were bound for Chicago, but did not know. She begged them to drive past home so that she might get her hat on a ruse that if she did get inside her home she would be safe from them. Before they left Stephenson's house, Stephenson said to Klinck, "You get in touch with," an officer, "right away and tell him we are going to Chicago on a business deal to make money for all of us." Then they started. Klinck was not one of the party in the automobile. Stephenson and Gentry sat in the car all of the time with her until they got to the train. On the trip from Stephenson's home to the railway station in Indianapolis, the automobile was stopped at the hotel and there "Shorty" went into the hotel and came back. While at this stop, Stephenson and Gentry refused to let her out of the automobile. At this time she was in a dazed and terrified condition and feared that her life would be taken by Stephenson. He told her that he was the law in Indiana and said to Gentry, "I think I am pretty smart to have gotten her."]

Stephenson, Gentry and she boarded the train, where all three went at once into the compartment or drawing room. She was in such condition that she could not remember all that happened after that, but she did remember that Gentry got into the top berth of the compartment. Stephenson then took hold of the bottom of her dress and pulled it over her head, against her wishes, and she tried to fight him away, but was weak

and unsteady. Then Stephenson took hold of her two hands and held her, but she did not have strength to get away, because what she had drunk was affecting her. Then Stephenson took off all her clothes and pushed her into the lower berth. After the train started, Stephenson got into the berth with her and attacked her, and, in so doing, he held her so she couldn't move and did not know and did not remember all that happened. She did remember that he chewed her all over her body; bit her neck and face; chewed her tongue; chewed her breasts until they bled and chewed her back, her legs and her ankles and mutilated her all over her body. She remembered of hearing a buzz early in the morning and the porter calling them to get up for Hammond. Then Gentry shook her and said it was time to get up and that they were to leave the train at Hammond, Indiana. At this time, she became more conscious, and, before they left the train, Stephenson was flourishing his revolver. Then she asked him to shoot her. He held the revolver against her side and she said to him again to kill her, but he put the gun away in his grip. During the night on the train, she heard no sound from Gentry. After the car porter called them, Stephenson and Gentry helped her to dress; then the two men dressed and took her off the train at Hammond. After leaving the train, she was able to walk with the two men to the Indiana hotel. During the night she begged Stephenson to send a telegram to her mother. At the Indiana hotel, Stephenson registered for himself and wife under the name of Mr. and Mrs. W. B. Morgan, address, Franklin, and were assigned to room 416. Gentry then registered under the name of Earl Gentry, address Indianapolis, Indiana, and was assigned to room number 417. The time they reached the hotel was about 6:30 o'clock in the morning. In the hotel lobby, when they entered, were two colored

bell boys and two colored girls. The three, as guests of the hotel, were taken up the elevator and shown to their rooms. During this time Miss Oberholtzer continued begging Stephenson to send a telegram to her mother. Stephenson then made her write a telegram and told her what to say in it. After the telegram was written, Gentry took it and said he would send it immediately. Stephenson then layed down on the bed and slept, while Gentry put hot towels and witch hazel on her head and bathed her body to relieve her suffering.

Breakfast was served in their room. Stephenson ate grapefruit, coffee, sausage and buttered toast. She drank some coffee, but ate nothing. At this time, "Shorty" came in the room. He said to Stephenson that he had been delayed getting them because he could not find the hotel where they were guests in Hammond. Then she asked Stephenson to give her some money, for she had none, so that she might purchase herself a hat. Stephenson told "Shorty" to give her money and he gave her $15.00 and took her out in the automobile. "Shorty" waited for her while she went into a store and purchased a hat, for which she paid $12.50. When she returned to the car, she asked "Shorty" to drive her to a drug store so that she might purchase some rouge. He then drove the car to a drug store, where she purchased a box of bichloride of mercury tablets, put them in her coat pocket and returned with "Shorty" in the automobile to the hotel. During the morning at the hotel, the men got more liquor at Stephenson's direction. Stephenson said they were all going to drive on to Chicago and made her write the telegram to her mother saying that they were going to Chicago. This was the telegram that Gentry took.

After she and "Shorty" returned to the hotel, she said to Stephenson to let her go into room 417, which was the room assigned to Gentry, so that she might lie

down and rest. Stephenson replied, "Oh no, you are not going there, you are going to lie right down here by me." She then waited awhile and until she thought Stephenson was asleep and then went into room 417 and Gentry remained in room 416 with Stephenson. There was no glass in room 417, so she procured a glass from room 416, laid out eighteen of the bichloride of mercury tablets and at once took six of them, which was about ten o'clock in the morning of Monday, March 16th, 1925. She only took six of the tablets because they burnt her so. Earlier in the morning she had taken Stephenson's revolver and thought to kill herself in Stephenson's presence while he was asleep. It was then she decided to try and get poison and take it in order to save her mother from disgrace. She knew it would take longer for the mercury tablets to kill her. After she had taken the tablets, she lay down on the bed and became very ill. It was nearly four o'clock in the afternoon of Monday that "Shorty" came into the room and sat down to talk to her. He said to her that she looked ill and asked her what was wrong, and she replied, "Nothing." He asked her where she had pain and she replied that pain was all over her. He then said to her that she could not have pain without cause. When she asked him, "Can you keep a secret?" He answered, "Yes." She said, "I believe you can." Then she told him she had taken poison, but that he should not tell Stephenson. She had been vomiting blood all day. When she said to him that she had taken poison, "Shorty" turned pale and said that he wanted to take a walk. He left the room and, in a few minutes, Stephenson, Gentry and "Shorty" came into the room very much excited. Stephenson then said, "What have you done?" She answered, "I asked "Shorty" not to tell." Stephenson then ordered a quart of milk and made her drink it and then she said to him and to the others that she had

taken six bichloride of mercury tablets, and said, "If you don't believe it, there is evidence on the floor and in the cuspidor." Stephenson then emptied the cuspidor, which was half full of clotted blood, into the bathtub and saw some of the tablets. She then asked Stephenson what he intended to do, to which he replied, "We will take you to a hospital and you can register as my wife. Your stomach will have to be pumped out." He said that she could tell them at the hospital that she had gotten mercury tablets through a mistake instead of aspirin. To Stephenson's suggestion, she refused to comply as his wife. Then it was that Stephenson said that they would take her home. She then said to Stephenson that she would not go home, but would stay at the hotel, and asked them to leave her and go about their own business or to permit her to register at another hotel under her own name. Stephenson then said, "We will do nothing of the kind. We will take you home," and that the best way out of it was for them to go to Crown Point and there she marry him, to which suggestion, Gentry said he agreed it was the thing to do. She refused. Stephenson then snapped his fingers and instructed "Shorty" to pack the grips. They then departed from the hotel. Stephenson assisted her down the stairs. Before leaving she asked "Shorty" to telephone to her mother. Stephenson said that he had already called her. She asked what her mother said and Stephenson answered, that, she said it would be all right if her daughter did not come home that night.

"Shorty" checked out of the hotel for the three and they then put her in the back seat of the automobile with Stephenson and the luggage and started for home. Her mind was in a daze and she was in terrible agony. After they had proceeded in the automobile a short distance, Stephenson ordered "Shorty" to take the auto license plates off the car, which "Shorty" did, and

Stephenson then directed him to say, if questioned, that they had parked in the last town where the auto plates had been stolen. On the journey back to Indianapolis she screamed for a doctor, and said she wanted a hypodermic to relieve the pain, but the men refused to stop. She begged Stephenson to leave her along the road some place, that someone would stop and take care of her, and said to Stephenson, that he was even then more cruel to her than he had been the night before. He promised to stop at the next town, but did not. Just before reaching a town he would say to "Shorty," "Drive fast, but don't get pinched." She vomited in the car all over the back seat and the luggage. Stephenson did nothing to make her comfortable upon the trip. He said to Gentry, "This takes guts to do this, Gentry. She is dying"; and that he said to Gentry he had been in a worse mess than this before and got out of it. Stephenson and Gentry drank liquor during the entire trip. Stephenson said also that he had power and that he had made a quarter of a million dollars and, that his word was law.

Upon reaching Indianapolis, they drove straight to Stephenson's house by way of 38th street and Emerson Avenue in Indianapolis. When the car reached Stephenson's garage, Stephenson said, "There is someone at the front door of the house," and told "Shorty" to go and see who it was. "Shorty" returned and informed Stephenson that it was Miss Oberholtzer's mother. Then Stephenson said, "You will stay right here until you marry me." One of the three men then carried her upstairs into the loft above the garage. Stephenson did nothing to relieve her pain while they left her in the garage until she was carried to her home about noon Tuesday, March 17th, 1925. A big man, as she says, Mr. Klinck by name, shook her and awakened her and said to her, that she must go home.

She asked him where Stephenson was, and he told her he did not know. She remembered here that Stephenson had told her to tell everyone that she had been in an automobile accident and then said to her, "You must forget this, what is done has been done. I am the law and the power." He repeated to her several times that his word was law. On account of her agony and suffering, she begged Klinck to take her home in Stephenson's cadillac car. He said he would order a taxi, but finally said he would take her in Stephenson's car. Klinck then dressed her and carried her downstairs from the loft and put her in the back seat of the automobile and drove to the home of her mother. She asked him to drive in the driveway, which he did, and then carried her into the house and upstairs and placed her on her bed.

At the time she was returned to her home by Klinck, her mother was away from home. There was in the house, at the time she returned, Mrs. Schultz, who roomed at the Oberholtzer home with her eldest son George. When Klinck carried Miss Oberholtzer into the house, Mrs. Schultz was preparing lunch in the kitchen for her son and heard a terrible groaning at the front door and then went to the dining room and saw Miss Oberholtzer being carried in. She then went to the stairway and saw her carried upstairs by a large man, whose name she did not know. When he came downstairs alone, she asked, "Is Madge hurt?" He replied, "Yes," and said she was hurt in an automobile accident. Mrs. Schultz asked him how badly and he replied, he didn't think any bones were broken. Then, she said to him, "I will get a doctor quickly," and he said, "Yes." Then Mrs. Schultz asked him who he was and he replied, "My name is Johnson from Kokomo," and said, "I must hurry," and hurrying on, kept his face toward the door. Mrs. Schultz got a good look at his face as he came down the stairway and recognized him

and identified him in the courtroom at the trial of appellant. This man, who gave his name as Johnson, was Earl Klinck.

Upon Klinck's departure from the house, Mrs. Schultz went up to see Miss Oberholtzer, whom she called Madge. The door to her room was closed and Mrs. Schultz knocked and heard Madge moaning, so she opened the door and went in and saw Madge on the bed. When she went in, Madge was groaning and was pale and could hardly speak or answer. Mrs. Schultz noted the bruises on Madge. The one on her right cheek was a dented wound of dark color; and on the left side of her chest were similar wounds, which were deeper and darker in color. The wound on her breast and the wound Mrs. Schultz noted were similar in shape and appearance. She noted that Madge had bruises across her stomach, on her limbs and ankles, which bruises were very dark in color in some places. The skin on her left breast was open. Her clothing, a black velvet dress and black shoes, were very mussed up and very dirty. Her coat had dropped off there in her room. She had on no hat. She looked very white around her mouth and groaned, "Oh!" and "Dear mother." She then said, "Oh, Mrs. Schultz, I am dying."

Miss Oberholtzer told Mrs. Schultz to call Doctor Kingsbury, which she did, and he arrived in less than an hour. Mrs. Oberholtzer, her mother, returned to her home about two o'clock in the afternoon. Upon Dr. Kingsbury's arrival at the home, he went immediately to see Madge and found her lying on her bed. He said she was in a state of shock. Her clothing was in a disheveled state; her face was pale; her body was cold and her pulse rapid. Her dress lay open in the front on her breast exposing bruised areas over her chest, with two or three lacerations, little cuts on the left chest; her right cheek had a bruised elevated area, dark

in color, egg-shaped in formation. He had been informed that she had been injured in an automobile accident and made a superficial examination through her clothing to determine whether bones were broken. After such examination, he had a conversation with her in which she told him she did not expect to get well and that she wanted to die. He told her that he found no bones were broken and asked her how she happened to be in this condition, to which she replied, "When I get better, I will tell you the whole story." Because of the state of shock and the condition, the doctor did not know how severely she was hurt or injured and pressed her for a reply. She then related to him the story, as related above, of the telephone call, her being escorted to Stephenson's home; of the drinking; of the ride to Hammond on the train; of her purchase of a hat and the poison and of her taking of the poison; and of the return trip to Indianapolis; of her pain and agony on the trip, how she begged Stephenson to procure a physician on the return and of his refusal to do so; of the arrival at Indianapolis about midnight and of her being taken to Stephenson's garage, where she was held a captive until 11:30 A. M. the following morning, and of her being taken home by Klinck, who told Mrs. Schultz that she had been injured in an automobile accident, and when she heard Klinck say this to Mrs. Schultz, she, Madge, raised upon her elbow and called, "He lies"; how that she had begged Stephenson, during the night in the garage after the return, to call a physician for her and that he did not grant her request.

After Dr. Kingsbury had heard her story, as thus related, he made a careful physical examination after a Miss Spratley, a nurse, had been called to care for her, and after Miss Spratly had removed the patient's clothes and cleaned her. As a result of this careful physical examination, Dr. Kingsbury found that Miss Ober-

holtzer had numerous bruised areas over her body; on her right cheek; over the chest; with lacerations on the left chest; a bruise as large as a dinner plate on the left hip and buttock; bruised and torn tissues down at the point of the vagina; a bruised discoloration, bruised areas down over her limbs and ankles; body very cold and pulse rapid. The doctor then had the patient catheterized and obtained some urine for examination, which he took with him to his office. He then washed her stomach and obtained mucus and blood therefrom. Upon examination, her urine showed a large collection of albumin, casts and blood cells, which were all evidence of acute kidney inflammation; that in his opinion, examination of the bruises and lacerations, the ones on the left breast and right cheek were inflicted by teeth, but he could form no opinion of the cause of the wounds in the vagina. He attended the patient until her death, April 14th, 1925, in Marion County, Indiana, during which time, he attended the patient by calls three to five times each day and called in other medical assistance. The lacerations on the left breast became infected, but had healed at the time of her death, leaving scars. The nature of the infection was the ordinary pus producer, which, ordinarily, was responsible for a pus infection, and was such an infection as might result from a bite.

Dr. Kingsbury did not have any further conversation with her concerning any other matter than her progress or the type of medication, except on March 28th in the early evening, when he advised her of her condition and outlook and, when no one else was present, he told her that she had no chance of recovery and no change to get well, and that she was going to die, and told her why, which was the result of the things that had happened to her, the shock, the loss of food, loss of rest, and the action of the poison on her system and her lack

of early treatment, and that the blood test, made that afternoon or the day before, was very much worse; and that her progress was unfavorable and that he was thus forced to inform her that she had no chance of recovery. She replied, "That is all right doctor, I am ready to die. I understand you doctor. I believe you and I am ready to die."

The other physicians, who were called in the case by Dr. Kingsbury, were Dr. H. O. Mertz of Indianapolis, who was a recognized authority on treatment of kidney disorders; Dr. John Warvel of Indianapolis, pathologist at the Methodist Hospital for some time; Dr. J. A. McDonald of Indianapolis, as a consulting physician; Dr. B. G. Jackson, of Indianapolis, specialist.

The statement of Dr. Kingsbury in evidence is that the chances, both for prolonging the victim's life and for her getting well, would have been better had she had treatment earlier, or within four or five hours after taking the poison; the delay caused by the automobile ride from Hammond to Indianapolis and the subsequent detention certainly tended to lessen her chances for recovery, or to shorten her life.

An attorney, a friend of the Oberholtzer family, visited at the Oberholtzer home frequently from March 17th, the time of Miss Oberholtzer's return from Hammond, to April 14th, 1925, the day on which she died. Miss Oberholtzer told the attorney the story of the incidents related and informed him that she knew she had no chance for recovery and was ready to die. From the statements so made by her to him, he prepared and had transcribed by typewriter a dying statement, which was read to her and in which she made corrections, and which was afterwards again prepared and read to her and approved and she signed the statement, saying therein that she had no hope of recovery; and that she believed and knew that she was about to die and that

she took an oath before a Notary Public of the truth of the statements made in the dying declaration.

The testimony of the physicians, who were in attenance upon Miss Oberholtzer as their patient during portions of the time after her return from Hammond until her death, and the consulting physicians, by their testimony, showed that the minimum fatal dose of bichloride of mercury is two to three grains, but larger doses are not necessarily more apt to be fatal, but the danger rests upon the amount of poison absorbed and retained; the form in which taken, whether tablets or powder; the promptness of vomiting or purging, efficiency of treatment, the fullness or emptiness of the stomach at the time the poison is taken by way of the mouth. Medical history shows that recoveries have occurred when as much as 500 grains were swallowed; the per cent of fatalities since A. D. 1910 is about 25 per cent and as low as 6 per cent in one hospital. The average time for the life of the patient after having taken the poison in a fatal dose is from five to twelve days. Medical history shows that some patients have died within a few hours after taking the poison and the longest reported case in medical history is that the patient died the 25th day after taking the poison, and that all reported cases of patients who lived beyond 25 days after taking the poison had recovered; that in a severe case, where the patient survived 29 to 30 days, as did Miss Oberholtzer, after taking the poison, and died, the consensus of opinion was stated that some other factor played a part in causing the death. The action of this poison, if the patient lives more than a few days, expresses itself in the kidneys and causes an acute nephritis of the kidneys to such an extent that there is a failure to secrete urine by those organs. Nephrities, caused by the poison if the patient lives beyond the 12th day, diminishes and the kidneys begin a process of repair and resumption of

their function, and that medical history shows that it requires five to twelve days for a human being to die if the kidneys are completely out of function. [The report of the post-mortem upon Miss Oberholtzer in evidence showed that the physician made such examination found an acute nephrities, the effect of bichloride of mercury on the kidney, degeneration of other organs in the liver and heart muscle, irritation of gastro-intestinal tract, abscess on one of her lungs, recently healed injuries on the surface of her body, four or five on the surface of her chest, one of which showed evidence of previous supporation, which was caused by the entrance of bacteria in that wound. ]Portions of the liver and kidneys were subjected to examination by Dr. Harger of Indiana University School of Medicine, the result of which, according to his evidence, showed that the injury to the kidney by the poison, which injury was termed nephritis, had almost healed and that the kidney tissues were in a state of advanced repair; the abscess in the lung contained pus or pus-forming germs which are carried by the blood stream by which circulation these germs coming from an infected wound, cause blood poisoning or pyemia; the symptoms of such pyemia are weakness, a rapid pulse and fever. The post-mortem examination showed that the lacerated and recently-healed infection over one of her breasts was the only one found from which pyemia could probably have resulted. The injury made to her breast could have been infected by human teeth, and wounds so made are apt to be infected by bacteria on the teeth and the mouth of the person biting, or such bacteria may be on the skin which are carried in beneath the skin by the injury. The opinion was that the infection in the lungs came from the infected area on the chest, and that the kidneys were also infected by the same bacteria, which, on account of the poisoning, would be less able to resist infec-

tion by the pus germs.· The abscess in the lung, the infection in the blood stream and the infection in the kidney all tended to prevent recovery and that it was highly probable that such infection contributed to the death of Miss Oberholtzer, but that she would have recovered from the effects of the mercurial poisoning had she not been so infected by the pus germs coming from the wound on her chest, because the kidneys had already accomplished a large amount of repair sufficient to carry on their function. The opinion was that the wounds made on her body could not have been caused in any manner by mercuric chloride.

The result of the post-mortem showed no effects of influenza in her lungs. There was no condition in the esophagus, mouth, stomach, intestines or liver due to mercuric chloride, which could of itself have resulted in death. It was stated that taking into consideration the facts given in evidence of the taking of possession of Miss Oberholtzer by appellant; her trip to Hammond; the taking of the poison; the return home and the time intervening from then until her death, a delay of twenty-four to twenty-six hours in administering remedies for mercuric chloride poisoning, materially reduced her chances of recovery.

A hypothetical question was asked of some of the physicians who had attended Miss Oberholtzer, the statements of which were the facts which had been introduced in evidence, with the addition of the following, that bichloride of mercury tablets, which she purchased and had taken, were, "Perhaps $7\frac{1}{2}$ or 7/38 grains each." The final sentence of the hypothetical question was, "Upon this hypothesis, Doctor, state what, in your opinion, was the cause of her death?" One doctor answered, "She died from an acute infection, superimposed upon an acute nephritis, in my opinion." And answering further as to what was the nature of the acute infection,

in his answer was, "that she had Staphylococci (pus) infection in her kidney." And answered further, in reference to mercuric nephritis that delay in medical treatment affected her chance of recovery in that it would allow more absorption of the drug and result in greater damage to the kidney. One of the other physicians testified, "The cause of her death, in my opinion, was some secondary complication superimposed upon nephritis." And further, that but for this infection, superimposed upon the mercuric nephitis, "I believe she would have recovered," and further that the delay of twenty-four to twenty-six hours in giving medical and nursing attention greatly increased chances of fatality.

Appellant was arrested by a party of four officers at his room in an hotel in Indianapolis. One of the officers knocked at the door of appellant's room, and, upon appellant opening the door, one of the officers asked him, "If Mr. Stephenson was in." Appellant answered, "No, Mr. Stephenson is not in, but I am his secretary, Mr. Butler." Upon further questioning, the man who opened the door and who said he was Mr. Butler, admitted that he was Mr. Stephenson, the appellant. The hotel clerks, the maid and the bell boys of the Indiana Hotel, Hammond, and the hotel clerk of the Washington Hotel, Indianapolis, where appellant had lodging, and where he was arrested, were witnesses, and whose testimony was corroborative of the facts in relation to what happened in the two hotels as narrated. The pullman conductor and pullman porter of the car in which appellant and the others made the journey to Hammond testified. The conductor identified Earl Klinck as the person from whom he took up three tickets in the Union Station in Indianapolis. He testified of the three, including appellant and Miss Oberholtzer, occupying the drawing-room in the pullman car; that he heard the woman vomiting in the toilet room, which is connected

with the drawing-room; that appellant ordered the other men to wet a towel in cold water to bathe her face; that, while in the room preparing the beds, appellant showed his revolver to the pullman porter, and identified the taller one of the two men in the courtroom, who occupied the drawing-room that trip, as Gentry, who was indicted with this appellant.

Appellant very earnestly argues that the evidence does not show appellant guilty of murder. He points out in his brief that after they reached the hotel, Madge Oberholtzer left the hotel and purchased a hat and the poison, and voluntarily returned to his room, and at the time she took the poison she was in an adjoining room to him, and that she swallowed the poison without his knowledge, and at a time when he was not present. From these facts he contends that she took her life by committing suicide; that her own act in taking the poison was an intervening responsible agent which broke the causal connection between his acts and the death; that his acts were not the proximate cause of her death, but the taking of the poison was the proximate cause of death. In support of his contention he cites *State* v. *Preslar* (1856), 48 N. C. 421; *Reg* v. *Donovan* (1850), 4 Cox 399; *Gipe* v. *State, supra; Treadwell* v. *State* (1884), 16 Tex. App. 560; *Bush* v. *Com., supra; State* v. *Shelledy* (1859), 8 Iowa 477; *Hendrickson* v. *Com.* (1887), 85 Ky. 281, 3 S. W. 166, 7 Am. St. Rep. 596, and other cases from other jurisdictions. In the case of *State* v. *Preslar, supra,* the defendant in the night time fought with his wife and she left to go to the home of her father. When she reached a point about two hundred yards from her father's home, she, for some reason, did not want to go in the house till morning, laid down on a bed cover, which she had wrapped around her, till

daylight. The weather was cold and the next morning she could not walk, but made herself known. She afterwards died. The court held that the wife without necessity exposed herself and the defendant was not guilty. In the case of *Reg.* v. *Donovan, supra,* the defendant struck his wife, and she went to the window to call for help and fell out. Defendant was charged with throwing his wife out of the window with intent to kill. The court held that the vidence must show that by his treatment he intended to make her jump out of the window. In the case of *Gipe* v. *State, supra,* the defendant broke into a house with intent to rob. The deceased ran out of the house and jumped into a well and remained there and died from exposure. The indictment charged death by violence, to wit, beating and striking. The court held that the evidence did not show the killing was by force and violence as charged, and did not follow the allegations in the indictment, and for that reason the cause was reversed. In *Treadwell* v. *State, supra,* the defendant shot the deceased, who lived from November till the following September. A few weeks before his death he had heart attack and convulsions. The court found that he died from heart attacks and the wounds inflicted by the defendant had nothing to do with the death. In the case of *State* v. *Shelledy, supra,* the defendant, with others, went in a body to the home of one W. armed with revolvers, and forcibly took possession of W. and bound his arms so as to render him helpless, and in the presence of W. avowed their purpose to kill W. and placed him in a hack and started to the timber with him, and when on the banks of the Iowa river he leaped from the wagon into the water, and they permitted him to drown, while standing by, and made no effort to rescue the said W. where by reasonable effort they might have done so. The court held that the defendant would be guilty of murder under these cir-

cumstances. In *Bush* v. *Com., supra,* defendant wounded one V. who was taken to the hospital and treated by a physician who communicated to her scarlet fever from which disease she died. The court said in that case, "If the wound is not dangerous and when in the natural course of events a new and intervening cause appears and causes the death, there is no guilt. If death was not connected with the wound in the regular chain of cause and consequence there ought not to be any responsibility. If a new and wholly independent instrumentality interposed and produced death the wound is not the proximate cause." The principal laid down in the last case is well supported by decided cases and text book writers, and we agree that the reasoning is sound and that it was properly applied in those cases. It is quite clear that in the Bush case there was no causal connection between the wound inflicted and the death. But we do not believe that the rules stated in the above case are controlling here. In the recent case of *Wilder* v. *Russell Library Company, supra,* the question of causal connection was discussed. In that case the commissioner awarded compensation to the claimant as a dependent of the deceased. The deceased had been librarian at the library of respondent employer, and as such was under the supervision of its trustees, in full charge of the library. She was very conscientious in her work, temperamentally zealous for the good of the library, working many hours overtime at her home evenings. She also engaged in outside activities which was occasioned by her position as librarian. The various work which she engaged in is set out in the opinion of the court which we will not take the time or space to set out here. Finally her health broke, which was followed by a nervous breakdown and while mentally irresponsible committed suicide. The court found that the worry, anxiety

and excessive nervous and mental activity in connection with the library work were all contributing factors in the ultimate mental breakdown. Here physical, mental and nervous disorder were all attributable to that work and traceable to her employment. The court said: "Before we can make a valid award the trier must determine that there was a direct causal connection between the injury, whether it be the result of the accident or disease, and the employment. . . . Was the employment a proximate cause of the disablement? . . ." The court held that it was and affirmed the award. See Wharton on Homicide, §374; *Rex* v. *Beech, supra; Wilder* v. *Russell Library Co., supra.* In the case of *Rex* v. *Beech, supra,* the prosecutrix was the village nurse and lived alone. At 11:45 P. M. on an evening in November the appellant came to her house when she was in bed. He entered the house by breaking a window and went upstairs to the bedroom occupied by the prosecutrix. The door was locked and the appellant threatened to break it open if the prosecutrix would not let him in. She refused and the appellant then tried to burst open the door. The prosecutrix called out, that if he got in he would not find her in the room, and as the appellant continued his attack upon the door the prosecutrix jumped out of the window sustaining injuries. The prosecutrix also testified that the appellant had attempted to interfere with her on a previous occasion when she had threatened to take poison if he touched her. The court approved the proposition as stated by the lower court as follows: "Whether the conduct of the prisoner amounted to a threat of causing injury to the young woman; was the act of jumping the natural consequence of the conduct of the prisoner and was the grievous bodily harm the result of the conduct of the prisoner." The court held that if these questions were answered in the affirmative he would be guilty. In *Rex*

v. *Valade* (Que.), 22 Rev. De. Jur. 524, 26 Can. Cr. Cas. 233, where the accused induced a young girl under the age of consent to go along with him to a secluded apartment, and there had criminal sexual intercourse with her, following which she jumped from a window to the street to get away from him and was killed by the fall. The accused was held guilty of murder. Bishop, in his work on Criminal Law, Vol. 2, 9th Edition, page 484, says, "When suicide follows a wound inflicted by the defendant his act is homicidal, if deceased was rendered irresponsible by the wound and as a natural result of it." See also *People* v. *Lewis* (1899), 124 Cal. 551, 57 Pac. 470, 45 L. R. A. 783. We do not understand that the rule laid down by Bishop, *supra,* that the wound which renders the deceased mentally irresponsible is necessarily limited to a physical wound. We should think the same rule would apply if a defendant engaged in the commission of a felony such as rape or attempted rape and inflicts upon his victim both physical and mental injuries, the natural and probable result of which would render the deceased mentally irresponsible and suicide followed, we think he would be guilty of murder. In the case at bar appellant is charged with having caused the death of Madge Oberholtzer while engaged in the crime of attempted rape. The evidence shows that appellant together with Earl Gentry and the deceased left their compartment on the train and went to a hotel about a block from the depot, and there appellant registered as husband and wife, and immediately went to the room assigned to them. This change from their room on the train to a room in the hotel is of no consequence, for appellant's control and domination over the deceased was absolute and complete in both cases. The evidence further shows that the deceased asked for money with which to purchase a hat, and it was supplied her by "Shorty," at the direction of appel-

lant, and that she did leave the room and was taken by "Shorty" to a shop and purchased a hat and then, at her request, to a drug store where she purchased the bicloride of mercury tablets, and then she was taken back to the room in the hotel, where about 10:00 o'clock A. M. she swallowed the poison. Appellant argues that the deceased was a free agent on this trip to purchase a hat and, etc., and that she voluntarily returned to the room in the hotel. This was a question for the jury and the evidence would justify them in reaching a contrary conclusion. Appellant's chauffeur accompanied her on this trip, and the deceased had, before she left appellant's home in Indianapolis, attempted to get away and also made two unsuccessful attempts to use the telephone to call help. She was justified in concluding that any attempt she might make, while purchasing a hat or while in the drug store, to escape or secure assistance would be no more successful in Hammond than it was in Indianapolis. We think the evidence shows that the deceased was at all times from the time she was entrapped by the appellant at his home on the evening of March 15th till she was returned to her home two days later, in the custody and absolute control of appellant. Neither do we think the fact that the deceased took the poison some four hours after they left the drawing-room on the train or after the crime of attempted rape had been committed necessarily prevents it from being part of the attempted rape. Suppose they had not left the drawing-room on the train, and instead of the deceased taking poison she had secured possession of appellant's revolver and shot herself or thrown herself out of the window of the car and died from the fall. We can see no vital difference. At the very moment Madge Oberholtzer swallowed the poison she was subject to the passion, desire and will of appellant. She knew not what moment she would be subjected to the

same demands that she was while in the drawing-room on the train. What would have prevented appellant from compelling her to submit to him at any moment? The same forces, the same impulses, that would impel her to shoot herself during the actual attack or throw herself out of the car window after the attack had ceased, was pressing and overwhelming her at the time she swallowed the poison. The evidence shows that she was so weak that she staggered as she left the elevator to go to the room in the hotel, and was assisted, by appellant and Gentry. That she was very ill so much so that she could not eat, all of which was the direct and proximate result of the treatment accorded her by appellant. We think the situation no different here than we find in the Beech case or the Valade case, *supra*. To say that there is no causal connection between the acts of .appellant and the death of Madge Oberholtzer, and that the treatment accorded her by appellant had no causal connection with the death of Madge Oberholtzer would be a travesty on justice. The whole criminal program was so closely connected that we think it should be treated as one transaction, and should be governed by the same principles of law as was applied in the case of *Rex* v. *Beech* and *Rex* v. *Valade, supra*. We therefore conclude that the evidence was sufficient and justified the jury in finding that appellant by his acts and conduct rendered the deceased distracted and mentally irresponsible, and that such was the natural and probable consequence of such unlawful and criminal treatment, and that the appellant was guilty of murder in the second degree as charged in the first count of the indictment.

Appellant complains of Instruction No. 41 given by the court of its own motion. This instruction reads as follows: "The law presumes that one intends the natural and probable consequences of his acts, whether he actually intended or anticipated them

or not. Of course such presumption can not be indulged in and carried to the extent of making one guilty of homicide on account of voluntary suicide of a sane person, where such suicide may have been induced or caused from remorse, grief, shame or humiliation growing out of some past action of himself or herself and another to which he or she had assented voluntarily. But if in such case, there be no voluntary assent on the part of such person taking his or her life, to such past action which caused such remorse, grief, shame and humiliation but that he or she was compelled to participate in such action causing such remorse, grief, shame or humiliation through force, threats, coercion and restraint of another. Then it is for the jury to determine whether or not the suicide in such a case, after considering all the evidence relating thereto, is the natural and probable consequence of the acts of such other person. If it is the natural and probable consequense of such act or acts, it is felonious homicide, otherwise it is not felonious homicide."

It may be questioned whether this instruction applies to count one or count two of the indictment, but even though it applies to count one we do not think it erroneous when read in the light of the allegations of count one and in the light of the evidence. The words "the suicide," as stated by appellant in his brief was used in this instruction in its common and usually accepted meaning, and the jury must have so understood the court to mean when he said "the suicide," it meant, the act of self-destruction, as shown by the evidence, and if they find that the suicide was the natural and probable result of the acts of appellant they necessarily had to find that the acts of appellant resulted first in rendering the deceased distracted and mentally irresponsible, for the willful and deliberate destruction of one's own

life is not the natural and probable action of one who is in sound mind. While it may be true that a person while in sound mind may deliberately and willfully take his own life, yet we cannot say that such an act is either the natural or probable thing for him to do. While on the other hand, it is the natural or at least the probable act of a person who has been rendered distracted and mentally irresponsible by the unlawful and criminal acts and conducts of another. We do not think the court erred in giving said instruction.

Instruction No. 43 given by the court of his own motion told the jury that, "One who inflicts an injury on another is deemed by the law to be guilty of homicide, if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor from responsibility. While it is true that a person can not be killed twice, yet it is equally true that two persons can contribute to cause the death of another in which case each will be responsible for such death."

We think the evidence justified the court in submitting the question to the jury, as there was evidence that the deceased died from the joint effect of the injuries inflicted on her, which through natural cause and effect contributed mediately to the death. We think the proposition of law stated in this instruction is well supported by authority. "The general rule, both of law and reason, is, that whenever a man contributes to a particular result, brought about, either by sole volition of another, or by such volition added to his own, he is to be held responsible for the result, the same as if his own unaided hand had produced it. The contribution, however, must be of such magnitude and so near the result that sustaining to it the relation of cause and effect, the law takes it within its cognizance. Now, these propositions

conduct us to the doctrine, that whenever a blow is inflicted under circumstances to render the party inflicting it criminally responsible, if death follows, he will be holden for murder or manslaughter, though the person beaten would have died from other causes, or would not have died from this one, had not others operated with it; provided, that the blow really contributed mediately or immediately to the death as it actually took place in a degree sufficient for the law's notice." Bishop on Criminal Law, sec. 653; 2 Whart Am. Crim Law, sec. 941; Michie, Homicide, Vol. 1, p. 11, §5; Bishop on Criminal Law, Vol. 2, §639 (2), p. 483; Brill Enc. Crim. Law, Vol. 2, §606; *Kee* v. *State* (1873), 28 Ark. 155; *Dumas* v. *State* (1909), 159 Ala. 42, 49 So. 224; *Bishop* v. *State* (1905), 73 Ark. 568, 84 S. W. 707; *People* v. *Lewis, supra; People* v. *Williams* (1915), 27 Cal. App. 297, 149 Pac. 768.

Appellants requested instruction No. 26 was in effect, a directed verdict in favor of appellant on count one. There was no error in refusing this instruction.

Instructions Nos. 58, 68, 84, 96 and 111, tendered by appellant and refused by the court, had to do with the question of reasonable doubt. The jury was sufficiently advised on this subject by instructions Nos. 16, 18, 19, and 20, given by the court, and for the court to read additional instructions on this question would have been only to repeat in substance what the court had already told the jury.

Instruction No. 78, requested by appellant and refused, in substance, told the jury that each juror must be convinced beyond a reasonable doubt of appellant's guilt before they were entitled under the law to return a verdict of guilty. This proposition was fully covered by the court's own instruction No. 17.

Appellant says the court erred in refusing his ten-

dered instruction No. 83, which reads as follows: "The court instructs you that if you should find Madge ▮ Oberholtzer had been assaulted and raped or had been assaulted and beaten with intent to rape, by the defendants, or either of them, and that said act by the defendants had already been completed and ended, and if you find that no attempt was being made by the defendants, or either of them, to repeat said act or acts, and if you further find that said Madge Oberholtzer under such circumstances voluntarily swallowed a fatal dose of bichloride of mercury poison with intent to take her own life, because she felt aggrieved on account of said prior acts of the defendants, or either of them, and that said bichloride of mercury caused her death, then you should not be warranted in finding the defendants guilty, and you should find them not guilty." This, in effect, is a preemptory instruction, and we think it entirely too narrow. All facts stated in this instruction, if true, would not entitle appellant to an acquittal. If this instruction be the law, then, a person would go acquit if he succeeded in completing his crime before the act of self-destruction was done, regardless as to what effect such acts might have upon the victim, or without regard to the question of natural or probable result of such criminal acts. We think this instruction was correctly refused.

Appellant's instructions Nos. 85, 99, 101, 116, 131, 132, 133, 145, 147, 148 and 149, were covered by instructions given and no error resulted from such refusal.

There was no reversible error in refusing appellant's tendered instructions Nos. 129, 135, 137, 138, and 140, as they are directed to the crime alleged in count ▮ four, and appellant was convicted on count one, and in effect was found not guilty under count four.

We have examined all the appellant's alleged errors

and find none that would justify a reversal of this cause. Judgment affirmed.

Treanor, J., dissents in part, concurs in part, dissents in conclusion. For opinion see post, p. 199.

Martin, J., dissents in part, concurs in part, dissents in conclusion. For opinion see post, p. 217.

ON PETITION FOR WRIT OF ERROR CORAM NOBIS.

PER CURIAM.—This is an original petition in this court for a writ of error *coram nobis.*

The petitioner was charged and convicted of murder, and upon appeal to this court the judgment was affirmed. *Stephenson* v. *State, ante.* 141.

Jurisdiction to grant writs of error *coram nobis* lies in the court that rendered the judgment. *Partlow* v. *State* (1922), 191 Ind. 657, 124 N. E. 483.

It has been said that after appeal and decision of a cause by this court, the judgment is the judgment of this court, but we cannot agree with this proposition. A common law appeal brought the whole case up to the appellate tribunal for re-examination on the merits as to both law and facts, and for decision as though no decree had ever been rendered. Upon decision of the case by the Appellate Court upon such an appeal, the judgment, of course, became the judgment of the Appellate Court.

A writ of error at common law is a method of bringing cases to an Appellate Court for review of supposed errors of law committed by the trial court. The case is not open for re-examination upon the whole merits, but every controverted question of fact is excluded from consideration, and the Appellate Court is confined to reviewing the rulings of the inferior court upon questions of law.

The statutory appeal to this court is in the nature of a common law writ of error, and brings the record

to this court for a review of assigned errors of law committed at the trial and apparent upon the record. We are not concerned with controverted questions of fact. If the judgment is affirmed it stands and is still the judgment of the lower court. If it is modified or reversed, the mandate of this court directs the lower court to modify its judgment or set it aside and grant a new trial, in which case another judgment results, but the final judgment is the judgment of the trial court and not of this court.

The effect of the decision of an appealed case upon the judgment below is the same in criminal and civil cases, and a decision by the Appellant Court has the same effect as a decision by this court. It is the law that a court of general jurisdiction may entertain an action to enjoin the operation of a judgment at law after an appeal and affirmance of the judgment by the Appellate Court. *Hitt* v. *Carr* (1922), 77 Ind. App. 488, 130 N. E. 1.

If it were true that after affirmance the judgment becomes the judgment of the Appellate Court, it is clear that a court of inferior jurisdiction cannot enjoin its operation.

Because any change or modification of the record pending an appeal would interfere with the appellate jurisdiction of this court, the jurisdiction of the trial court to act in the case is suspended pending the appeal, but upon leave being granted by this court it may entertain such a petition pending the appeal, and if the petition is denied, the record of the proceeding may be certified to this court as part of the appeal, and if the petition is granted and the facts certified to this court, the appeal will be dismissed and the judgment may be then vacated and a new trial had.

"The writ of error *coram nobis* is not intended to authorize any court to review and revise its opin-

ions; but only to enable it to recall some █ adjudication, made while some fact existed which, if before the court, would have prevented the rendition of the judgment, and which, without any fault or negligence of the party, was not presented to the court." *Sanders* v. *State* 1882), 85 Ind. 318, 44 Am. Rep. 29.

The evidence by which the existing fact can be proved must be set out in the petition, and the petition must allege facts showing that by the exercise of diligence the petitioner would not have been able, █ █ and was not able, to produce the facts relied upon at the trial or before judgment, by motion for a new trial or otherwise. Insofar as applicable, the sufficiency of the petition will be tested by the rules applicable to motions for a new trial because of newly-discovered evidence.

In *Wheeler* v. *State* (1902), 158 Ind. 687, 63 N. E. 975, it is said that a writ will not be granted except where it clearly appears that the petitioner had a valid defense in the facts of the case.

The state may dispute the facts alleged, and the █ issue of fact thus arising is to be decided by the court without a jury.

The writ will reach only matters not cognizable on motion for a new trial, or in arrest of judgment, or on appeal. It represents that justice has been circumvented, and that in effect a fraud has been █ perpetrated upon the court that entered the judgment. The only relief that can be granted is the setting aside of the judgment and the granting of a new trial.

Insofar as they are not in agreement with this opinion, the cases of *Partlow* v. *State, supra; Partlow* v. *State* (1924), 194 Ind. 172, 141 N. E. 513, 30 A. L. R. 1414; *Partlow* v. *State* (1924), 195 Ind. 164, 144 N. E.

661; and *Davis* v. *State* (1928), 200 Ind. 88, 161 N. E. 375, are disapproved.

Article 7, Section 4, of the Constitution provides that this court "shall also have such original jurisdiction as the general assembly may confer." No jurisdiction to entertain an original petition for a writ of error *coram nobis* has been conferred by statute, and there is none. The court in which the judgment was originally entered has no jurisdiction to entertain such a petition pending disposition of an appeal to this court, but it has jurisdiction to do so after remittitur.

For the reasons given the petition must be dismissed, but we have, nevertheless, considered its merits for the guidance of petitioner and the trial court in case that a petition should be filed later in the court below. It is most voluminous, and is largely given over to the recital of a weird tale of intrigue by which it is sought to show that an army of petitioner's associates, certain politicians and high officials of this state conspired together to bring about the death or imprisonment of the petitioner. All of these facts are irrelevant and collateral to the issue.

It is alleged that the petitioner was prevented from testifying at the trial through fear of being shot on the witness stand, and that if he had taken the stand in his own defense he would have testified that another person, one of the conspirators, had committed the murder with which he was charged. The facts about which he would have testified to establish that same other person was responsible are not set out, nor are the facts to which any other witness or witnesses would testify set out, nor the names of any such witnesses. It is alleged that he will produce this undescribed evidence "in open court" upon another trial.

The allegations are not sufficient. The facts which would have prevented the rendition of the judgment,

had they been known at the trial, must be set out so that they may be scrutinized by the court hearing the petition. The record of the trial is before us and we take cognizance of it. There is overwhelming evidence that the petitioner, and not someone else, was with Miss Oberholtzer and was responsible for the acts which it was charged caused her death. The defense made at the trial was entirely inconsistent with the theory of this petition. It is not alleged in the petition that any of the witnesses who testified at the trial would repudiate their testimony connecting the petitioner with the person charged to have been murdered at the time the acts were committed which were charged to have caused her death, and which the jury evidently believed did cause her death. It follows that any evidence which might be produced tending to establish that another, and not the petitioner, was responsible for the death, would merely conflict with other substantial and convincing evidence.

The whole showing made, including the irrelevant and immaterial matter, is not even mildly persuasive that there was a valid defense upon the theory suggested.

It is also asserted that petitioner's enemies caused hostile crowds to fill the court room during the trial and stir up popular prejudice and hostility against him, and that certain of his enemies had arranged that he would be shot if he took the witness stand. The testimony by which he hopes to support the allegation that he would be shot if he took the witness stand, insofar as it is disclosed, consists of his affidavit and the affidavits of several others that they believed he would be shot. But, if, in fact, the belief existed in his mind at the time of the trial and it accounted for his not going upon the witness stand, definite evidence of that fact could have been produced.

Popular prejudice and hostility, excitement and indig-

nation, are the natural result of shocking crimes. It cannot be excepted that a community will remain calm when such offenses have been committed and the perpetrators are being tried. But even where they exist and are given audible expression, there is not always sufficient ground for a belief on the part of the accused that he dare not demand the rights secured to him by law. *Wheeler* v. *State, supra.*

It is apparent from the record that at no time was there an attempt by any one to interfere with the regular and orderly proceedings of the court.

It is alleged that because of fear and threats the petitioned signed the motion for a new trial without reading it, but it is not alleged that his attorneys failed to set out in the motion every available ground for a new trial, nor that he had no opportunity to acquaint his attorneys with any fact which he desired to have set up as a cause for a new trial. Petitioner's rights were asserted vigorously and fearlessly by resourceful and intelligent counsel, who, no doubt, were cognizant of everything that took place, and of petitioner's reasons for not testifying in his own defense. The record is interspersed with objections, arguments and debates of petitioner's counsel, from all of which it appears that the defense was not upon the ground that some one else, and not the defendant, was responsible for the acts charged. Two hundred and ninety-four causes are assigned in the motion for a new trial, and it is indicated that petitioner's counsel sought to present every question that came to their notice and that they believed available.

The petition is dismissed.

### TREANOR, J., DISSENTING IN PART, CONCURRING IN PART, DISSENTING IN THE CONCLUSION.

I agree with the *per curiam* opinion that there was no error in overruling the motion to quash the first

count and reach this conclusion by construing the first part of the first count down to and including the allegations respecting the taking of poison as charging a killing in an attempted rape. The first count contains three more or less distinct sets of allegations, each setting out a species of wrongful conduct. One set centers around the actual rape, or attempted rape; the second includes the facts of the procuring and taking of the poison, and the third relates to the withholding of aid after the poison had been taken. But since the first count closes with the allegation that Madge Oberholtzer died "from the effects of her wounds inflicted as aforesaid and said poison taken as aforesaid" it may be construed to charge that the defendants caused the death of Madge Oberholtzer by reason of wounds inflicted during the perpetration of the attempted rape and by reason of poison taken as a result of the attempted rape. I also agree with the *per curiam* opinion in construing "distracted with the pain and shame so inflicted upon her" to be equivalent to saying that the victim of the assault was in a state of mental irresponsibility when she procured and took the poison. As I shall later point out I do not think that the trial was conducted on the theory that these words imported the fact of mental irresponsibility; but as against a motion to quash they should be so construed. (See 18 C. J. 1289; Webster's New International Dictionary under "distraction;" see also §§3424 and 900, cl. 3, Burns Ann. Ind. St., 1926, and in connection therewith, *Goodwin* v. *State* (1884), 96 Ind. 550, especially on Petition for Rehearing; *Sage* v. *State* (1883), 91 Ind. 141, 145). But this construction of Count 1, which enables us to say that there was no error in overruling the motion to quash, eliminates from the charge of murder in an attempt to rape all of those allegations respecting the withholding of aid and forces the conclusion that the trial court erred in overruling

the motion to strike out that portion of Count 1 which contained these allegations of failure to furnish aid during the return trip to, and after arriving in Indianapolis. For despite the State's insistence that "the whole trip from Indianapolis to Hammond and return forms a part of the *res gestae* relating to attempted rape" we cannot ignore the plain fact that there was no attempt to commit rape after the parties registered at the hotel at Hammond. The allegations respecting the taking of poison are properly included in the first count charging murder in an attempted rape on the assumption that the count charges that the actual attempt to rape caused the taking of the poison; but since the alleged acts of failure to provide aid were not a part of the attempted rape, or causally connected therewith, their inclusion in the first count cannot be justified by calling them "a part of the *res gestae* of attempted rape."

We understand the *per curiam* opinion to hold that these allegations should have been stricken out as surplusage, but that the refusal to strike out was harmless error. The case of *Torphy* v. *State* (1918), 187 Ind. 73, 118 N. E. 355, is authority for the rule that a motion to strike out is the correct procedure to remove improper matter from an indictment when the presence of the improper matter does not constitute one of the statutory grounds for a motion to quash; and in that case this Court held that the trial court committed reversible error in overruling a motion to strike out of the indictment certain prejudicial allegations. We agree with the analysis of *Torphy* v. *State, supra,* contained in the *per curiam* opinion, but do not accept the reasoning by which the opinion reaches the conclusion that the force and authority of that case is limited to the error in overruling a motion to strike out allegations from an indictment only when these allegations serve the pur-

pose of "conveying facts to the jury that could not be properly presented in evidence from the witness stand." (*Per curiam* opinion, *supra,* p. 194.)

That particular danger did not exist in the instant case since, as the majority opinion points out, the objectionable allegations in the first count were all included in the fourth count, and any evidence which might have been admitted to support the allegations in the first count was clearly admissible under the fourth count. In fact most, if not all, of the facts alleged in the first count relating to failure to furnish aid were competent evidence under the *res gestae* rule of evidence. But the defendant's interests were seriously prejudiced because the retention of the allegations in question must have confused and misled members of the jury as to the scope of Count 1, and as to the proper application of that part of the evidence which supported the allegations. Indeed, when we consider Instructions 46 to 50, it seems inevitable that the jury understood that the objectionable allegations in themselves constituted and charged a separate and distinct offense of felonious homicide under Count 1. The substance of these instructions, as applied to the evidence in the case is fully and clearly indicated by Instruction No. 48 which is as follows:

"If you are convinced by the evidence beyond a reasonable doubt that these defendants or any of them voluntarily took Madge Oberholtzer into their custody while she was in a weak, sick or helpless condition from any cause whatsoever, and continued to exercise such control and custody over her, and that while they were so exercising such control and custody over her, she became violently ill from any cause whatsoever, then I instruct you that it was their duty under the law to care for her without wicked negligence, to supply her with care and medical attention if necessary within their means and to render her whatever assistance the evidence in this case shows beyond a reasonable doubt to

have been necessary to the preservation or the prolongation of her life and if you believe from all the evidence in this case that they did so take her into custody, and that she did become violently ill for any reason whatsoever, and if you further find that they failed and refused to render her such medical attention and assistance within their means, and if you further find that she afterward died as a result of such failure to render her such medical assistance, or her life was shortened by the failure on the part of these defendants or any of them so to act, then I instruct you that they are guilty of manslaughter if you find said omission to act was mere negligence, but if you find that such omission or failure to act was done willfully, with a reckless disregard of the consequences, then I instruct you that they would be guilty of murder."

The State insists that Instructions 46, 47 and 48 were "clearly confined to Count 4, which was the only one on the theory of willful murder by reason of failure of appellant to perform the legal duty of affording care and medical relief after the poison was taken;" although "the State agrees with appellant that Instruction No. 47 given by the Court, is not applicable to Count 1 under which alone the appellant was found guilty." (Appellee's Brief, p. 153.) If these instructions were "clearly confined" to Count 4 it must be presumed that the jury so understood, and, consequently, any intrinsic defects in the instructions were rendered harmless by the failure of the jury to convict on Count 4. But it appears to the writer that these instructions clearly were not confined to Count 4. In none of the Instructions 46 to 50, inclusive, is there any statement expressly limiting the instruction to Count 4; and the phraseology and content suggest equally the objectionable allegations in Count 1 and the allegations in Count 4; and when we consider Instructions 49 and 50 it is clear that the trial court intended that the jury should apply these instructions to Count 1. To get the full force of these two

instructions it is necessary to consider that the evidence did not clearly show to what extent Klinck, one of the defendants, participated in the criminal transaction, and especially that part of the affair which involved the trip to Hammond and the criminal assault. In Instruction 49 the court correctly charged the jury respecting Klinck's responsibility for acts of his codefendants committed outside his presence and in Instruction 50 makes the following statement:

". . . unless you are convinced beyond a reasonable doubt that said Klinck was a party to, or participated in a plan of said other two defendants or either of them to entrap and to make a criminal assault upon the person of Madge Oberholtzer, as alleged in the indictment, with knowledge of the purpose of said plan, he could not be liable for the acts of said other two defendants or either of them, outside his presence, and during said trip to Hammond, if you find such trip was made; . . .; and although he might not have been a party to such a plan, as alleged, and hence not liable for the acts of said other defendants, while on said trip, if such trip was made, yet if you are convinced by the evidence beyond a reasonble doubt that subsequently said Madge Oberholtzer was returned to the garage of the defendant Stephenson, in a weakened and helpless condition, in which condition she was placed into the custody and control of said Klinck in said garage which he assumed and undertook to perform, then I instruct you that at that time there was a legal duty resting upon him to use all reasonable means within his power to care for her, and if he failed to do so, either by an act of commission or an act of omission, by reason of which her life was shortened *he would be guilty of felonious homicide under the first or fourth count of the indictment.*" (Our italics.)

In the foregoing the trial court told the jury that Klinck might be convicted of felonious homicide under the first count even though the jury should find that he was not responsible for any of the acts of his codefend-

ants prior to the trip back to Indianapolis, provided only the jury should find that he was criminally responsible for withholding aid and that such withholding of aid shortened the life of Madge Oberholtzer; and we must necessarily conclude that the trial court and the jury understood that the allegations in the first count covering the failure of defendants to supply aid constituted either a charge of felonious homicide as a substantive offense, separate from and independent of the charge of murder in the attempted rape, or an essential element in the offense of murder in the attempted rape, to the same purpose and effect as the wounding and the taking of the poison. If the former was the jury's understanding then the appellant Stephenson was in fact, no matter what this Court's theory of the scope and construction of Count 1 may be, tried and convicted on a count charging two distinct and separate substantive offenses, on one of which he could be convicted of murder without any allegation or proof of purpose to kill and on the other of which the degree of homicide might range from involuntary manslaughter to first degree murder. If the latter was the jury's understanding, the appellant was convicted under a count which permitted the jury to find him guilty of murder in the attempted perpetration of a rape, in case the jury should find that he was guilty of an attempted rape and also found that he accelerated or caused the death of his victim by negligently failing or refusing to supply aid; and he could be convicted thus, without the necessity of the jury's finding that the appellant was legally responsible for the taking of the poison or to what extent, if any, the wounds contributed to the death of the victim. The injury to the appellant is obvious. The evidence showed only three possible causes of death, the wound on the breast, the poison and the withholding of aid. The evidence connecting the wound with the death

is, at the best, strikingly weak and unsatisfactory. The jury reasonably might have found that it was not a factor. Both the *per curiam* and the individual opinions agree that in order for the appellant to be legally responsible for the taking of the poison by his victim it was necessary that the jury find that the natural and probable consequence of appellant's mistreatment of Madge Oberholtzer was to render her mentally irresponsible, and also find that while thus mentally irresponsible and as a result thereof she procured and swallowed the poison. Under the foregoing test the jury reasonably could have concluded that Stephenson was not legally responsible for Madge Oberholtzer's act of taking the poison. Further, both the *per curiam* and the individual opinions agree that the alleged acts of Stephenson in refusing or withholding aid cannot be considered a part of the offense of murder in attempted rape. In view of the foregoing it is clear that the defendant was entitled to have the jury understand that he could not be convicted on the charge of murder in an attempted rape unless the jury should find: (1) That the wound, with the resulting infection, caused death, or (2) that the defendant was legally responsible for the taking of the poison, and that death was caused by the poison, or (3) that the defendant was legally responsible for the taking of the poison and that the death resulted from the concurring effects of the wound and the poison. The defendant was entitled, also, to have the jury understand that the allegations respecting withholding of aid, insofar as they charged a public offense, charged the offense of homicide in the commission of an unlawful act, and that the defendant might be convicted on this charge only under Count 4, and could be convicted of murder on this charge only in case the jury should find that the unlawful act (i. e., failing or refusing to afford aid) was committed for the pur-

pose of causing the death of Madge Oberholtzer. Further, it was of vital importance to the defendant's legitimate defense that the jury clearly understand that the unlawful act of refusing aid could not be substituted, as a cause of death, for either the wounding or taking of poison, in order to make out the offense of murder in attempted rape as charged in the first count. I do not mean to say that evidence of the failure to supply aid could not be introduced to show the efficacy of either the poison or the infection from the wound in causing death. But I do mean to say that if the jury concluded that the infection from the wound on the breast was not an appreciable factor in causing death, and if the jury also concluded that the defendant was not legally responsible for the taking of the poison, both of which conclusions would not have been unreasonable, then the jury could not have found the defendant guilty of murder in an attempted rape, even though we assume that the jury was convinced beyond a reasonable doubt that the defendant was under a legal duty to furnish care and medical aid to Madge Oberholtzer and that by reason of his failure or refusal to do so accelerated or caused her death. Under the last assumption the defendant was undoubtedly guilty of felonious homicide under Count 4, but the degree of homicide had to depend upon the mental state of the defendant in fact; and could not be supplied by, or presumed from the fact of the attempted rape.

I am convinced that the retention in the first count of the objectionable allegations and the effect given them, as indicated by Instructions 46 to 50, misled the jury as to the scope of the first count, as construed and limited by both the *per curiam* and individual opinions, and consequently substantially prejudiced the interests of the defendant.

I think the trial court committed further reversible

error in the giving of Instruction No. 41. This instruction is as follows:

"The law presumes that one intends the natural and probable consequences of his acts, whether he actually intended or anticipated them or not. Of course such presumption can not be indulged in and carried to the extent of making one guilty of homicide on account of voluntary suicide of a sane person where such suicide may have been induced or caused from remorse, grief, shame or humiliation growing out of some past action of himself or herself and another to which he or she had assented voluntarily. But if in such case, there be no voluntary assent on the part of such person taking his or her life, to such past action which caused such remorse, grief, shame and humiliation but that he or she was compelled to participate in such action causing such remorse, grief, shame or humiliation through force, threats, coercion and restraint of another. Then it is for the jury to determine whether or not the suicide in such a case, after considering all the evidence relating thereto, is the natural and probable consequence of the acts of such person. If it is the natural and probable consequence of such act or acts, it is felonious homicide, otherwise it is not felonious homicide."

Instruction 41 undoubtedly referred to, and was understood by the jury to refer to, that particular part of Count 1 which alleged the facts respecting the taking of poison by Madge Oberholtzer, since that part alone involves the question of suicide.

. This instruction must be considered in the light of the holding of both the *per curiam* and individual opinions, that the defendant was not legally responsible for Madge Oberholtzer's act of procuring and swallowing the poison unless the poison was procured and swallowed by her while in a state of mental irresponsibility induced by the wrongful acts of the defendant, and the natural and probable result thereof. (See *per curiam, supra,* p. 141.) And I believe that Instruction 41 violates the foregoing by omitting the element of mental

irresponsibility and by making the responsibility of the defendant for the act of self-destruction depend on the simple test of whether, according to the standard of the jury, her act was the natural and probable consequence of the misconduct of the defendant. I appreciate that the *per curiam* opinion, while recognizing the necessity of the element of mental irresponsibility, construes the instruction to mean that if the jury found "that the suicide was the natural and probable result of the acts of appellant they necessarily had to find that the acts of appellant resulted first in rendering the deceased distracted and mentally irresponsible; for the willful and deliberate destruction of one's own life is not the natural and probable action of one who is in sound mind." But as I construe Instruction 41 it told the jury that it could find "that the suicide in such a case" was the "natural and probable consequence of the acts of such person" even if the one committing suicide was of sound mind. I agree with the *per curiam* statement that a deliberate and willful taking of one's own life is not a natural and probable act of one of sound mind; and consequently it follows that a wrongdoer is not required by law to anticipate such an act, by one of sound mind, as a legal consequence of the acts of the wrongdoer. But we cannot assume that one of sound mind will not commit suicide, and then, by process of reasoning backward, conclude that one who commits suicide is not of sound mind. The fatal defect in Instruction 41, as I interpret it, is that the jury could find the appellant legally responsible for the deceased's act of procuring and taking poison without definitely determining: (1) Whether the victim was in fact rendered mentally irresponsible by the act of the appellant; (2) whether this condition was the natural and probable consequence of appellant's acts; and (3) whether the act of self-destruction was the natural and probable

consequence of the mental derangement. The last-mentioned element has a special significance in this case, since it would seem necessary that there be some reasonable relation between the act of the mentally irresponsible person and the particular type of mental irresponsibility.

In Instruction 6, tendered by appellant, the court defines suicide thus:

"Suicide is taking one's own life while possessed of *sound mind*." (Our italics.)

Instruction 41 first carefully stated that a person cannot be held to anticipate as a consequence of his acts, a "voluntary suicide of a sane person where such suicide may have been induced or caused from remorse, grief, shame or humiliation growing out of some past action of himself or herself and another to which he or she had *assented voluntarily*." (Our italics.) The court then states the conditions under which it is "for the jury to determine whether or not the suicide in such a case, after considering all the circumstances relating thereto, is the natural and probable consequence of the acts of such other person." It is clear from this statement of conditions that the criminal responsibility is made to depend upon the question whether the victim of self-destruction was a willing or unwilling participant in the "past action causing such remorse, grief," etc. There is no suggestion that the mental irresponsibility of the victim is a factor "in such a case" and we think it impossible to construe the instruction to require the jury to find that the defendant should have anticipated, as the natural and probable result of his conduct that Madge Oberholtzer would be rendered mentally irresponsible; and to further find that she was rendered mentally irresponsible, and as a consequence of her mental irresponsibility committed suicide. The fact of forced participation would, of course, be important evi-

dence in gauging the mental and emotional reaction of the victim for the purpose of determining whether she was in fact rendered mentally irresponsible, but such fact should not be made the basis of a rule of law which creates a class of cases in which criminal responsibility is determined by the varying and undefined standards of juries as to when a "suicide of a sane person" is the natural and probable consequence of the acts of another.

Instruction 42 sets out in detail the facts to be considered by the jury in determining whether the deceased was a "willing or unwilling participant on the trip in question . . ." and obviously the instruction was given to supplement Instruction 41 and to help the jury determine the specific question of whether there was "voluntary assent . . . to such past action which caused such remorse, grief," etc. When we consider Instructions 41 and 42 together we are the more firmly convinced that the plain and natural meaning is that the jury should first determine whether the deceased was a voluntary participant in the acts which caused the shame and humiliation; and if it was found that she was not a voluntary participant then it was for the jury simply to determine, on the basis of its own standard, "whether or not the suicide in such a case, after considering all the evidence relating thereto, is the natural and probable consequence of the acts of such other person."

That the trial court did not consider mental irresponsibility a necessary factor in determining the responsibility of the defendant for the procuring and taking of the poison is indicated by the remarks of the judge, before the jury, when overruling an objection to the introduction of an alleged dying declaration. These remarks are set out in full in the opinion of Martin, J., in connection with his discussion of their prejudicial effect upon the jury and I shall not repeat them here.

Since I agree with Martin, J., that their prejudicial character was in itself sufficient to constitute reversible error, I shall call attention merely to their significance in connection with Instruction 41. Nowhere in the trial court's comments is there any suggestion of the necessity of the element of mental irresponsibility in order to transform the "suicide" into homicide. The tenor of the remarks is indicated by the following: "The question is, must these men anticipate this *suicide* (our italics) as a reasonable result of their acts?" or by ". . .; then I must anticipate this woman is liable to kill herself, and if that is the natural consequence of the act that I have done, then it is for the jury to determine, and if it considered it a natural consequence, then this evidence is admissible."

The trial court's refusal to give Instruction 116 tendered by appellant is understandable only on the assumption that soundness or unsoundness of mind was not the determining factor in fixing the responsibility of the appellant for the act of self-destruction of Madge Oberholtzer. The tendered instruction is as follows:

> "The law presumes that one intends the natural consequences of his acts. I instruct you, however, that such presumption cannot be indulged in and carried to the extent of making an accused guilty of homicide, on account of the voluntary suicide of a sane person, even where such suicide may have been induced or caused from remorse, grief, shame or humiliation growing out of some past action of the accused on or against the deceased."

We think the above instruction was clearly proper and should have been given, under the theory, which is accepted by both the *per curiam* and individual opinions, that the appellant was not legally responsible for the deceased's act of procuring and taking poison, if at the time of such act she was of sound mind.

We, of course, recognize that if one is not free to

refrain even from an act of self-destruction by reason of present physical or mental coercion by another, or by reason of a state of mental irresponsibility induced by present or past acts of another, that an act of self-destruction may be, in fact and in law, the act of the one exercising the physical or mental coercion or causing the state of mental irresponsibility. But it is equally true that one cannot be criminally responsible for the voluntary self-determined act of another, who at the time of doing the act is in a position to act or refuse to act. The law does not give the victim of criminal misconduct the power to transform, by his own deliberate act, this criminal misconduct into a more serious criminal offense. So in this case, no matter how reprehensible the conduct of the defendant was prior to the moment the deceased took the poison, he was not a murderer, and the unfortunate victim of his misconduct could not by deliberately choosing to destroy her own life make him a murderer.

### Evidence on mental irresponsibility.

I think there was some evidence to support a finding that Madge Oberholtzer was mentally irresponsible when she procured and swallowed the poison. There were facts and statements which, standing alone, would indicate a clear-minded and reasoned act of self-destruction, attended by a complete comprehension of the moral and physical consequences of her act and a sufficient mental power and control to make a choice. But we cannot ignore the terrific array of facts relating to the bestial mistreatment of the deceased, nor can we safely estimate the precise effect on the mind of the victim of her terrible experience. The irresistible impulse test of insanity, as recognized in Indiana, increases, I think, the danger of saying there was no evidence to support a finding of mental irresponsibility

amounting to insanity, and if that question had been presented to the jury under proper instructions I could agree with the *per curiam* opinion in holding that such finding was supported by the evidence.

## THE WOUND ON THE BREAST AS A CAUSE OF DEATH.

There is sufficient evidence to establish that the appellant caused a laceration of the deceased's breast while engaged in the attempt to commit the rape; and the evidence also establishes that this wound became infected. The post-mortem examination disclosed an abcess in one lung and at least one expert testified that in his opinion "the infection found in the lungs came from the infected area, recently healed, in the skin on the chest." Dr. Warvel, expert witness for the State, testified as follows: "I would not say certain that because there was an abrasion on one of the breasts and an abcess in one of the lungs that it would necessarily follow that one communicated germs to the other unless I could prove there was no other avenue of infection." The evidence showed conclusively that Madge Oberholtzer had suffered an attack of flu a short time before her death and the evidence of experts established that one of the common after effects of flu is an abcessed condition of the lungs. In view of all the evidence on this point I feel that the conclusion that the abcessed condition of the lung was caused by the infected abrasion on the skin must be as nearly a purely speculative inference as any conclusion can be and yet be entitled to the name of expert opinion. But granting that it was admissible, and it evidently was, I do not feel free to say there was no evidence to show that the abcess in the lung was the result of the infected abrasion on the breast. But there still remains the problem of deciding whether the infection in the lung can be held to have been a proximate cause of the death

or whether, at the most, it merely created a condition which might or might not have added to the efficacy of the poison. I agree with the conclusion of Martin, J., that "from the viewpoint of a court in determining the guilt or innocence of one charged with murder by infliction of a bite, (which was not in itself a dangerous wound) such bite and the infection resulting therefrom could not be "superimposed" upon the dangerous condition arising from poison which was afterwards taken, so as to make the bite and not the poison the proximate cause of death." (See opinion of Martin, J., p. 217, and preceding discussion.)

### Jurisdiction of the Hamilton Circuit Court.

I concur with the *per curiam* opinion in holding that the Hamilton Circuit Court acquired jurisdiction of the subject-matter of this cause despite the fact that upon change of venue from the Criminal Court of Marion County to the Hamilton Circuit Court the copy of the orders and proceedings had in the cause while pending in the Criminal Court of Marion County was not authenticated by the signature of the clerk of that court.

### Admissibility of dying declarations.

As respects the admissibility of the two dying declarations, one written and the other oral, I think both the *per curiam* opinion and the opinion of Martin, J., conclusively show that the written declaration was properly admitted. There is some room for doubt about the admissibility of the oral declaration, the content of which was testified to by Dr. Kingsbury. At the time of the statements which constitute this declaration were made to Dr. Kingsbury the deceased also made some remarks which indicated she was not anticipating immediate death; and death did not ensue for some time after the declaration was made. But inasmuch as the evidence shows that poison had been taken by the de-

clarant for the purpose of causing her death, and since various remarks by her indicated that she firmly believed that she would eventually die as a result of her condition, and since she did in fact die as a result of such condition, I think that the requirement that such declarations be made with a definite and firm conviction of impending death was satisfied. It is true, that at the time the declaration was offered in evidence the proper foundation had not been laid for its introduction; but since all the proof necessary for such foundation was later offered and admitted I feel that the technical error in admitting the dying declaration without this proof first having been offered was harmless, and especially so, in view of the fact that the substance of the oral declaration was included in the written declaration which was admitted after the proper foundation had been laid.

The reasons which I have given in support of my conclusion that the trial court committed prejudicial error in overruling the motion to strike out and in giving Instruction 41 are not intended to imply that the trial judge was either confused or inconsistent in his rulings. His construction of Count 1 and his rulings and instructions based thereon were consistent. Yet it is evident that the trial court's construction of Count 1, as understood by the writer, would, if accepted by this Court, make Count 1 bad as against a motion to quash on the ground of uncertainty. But the vital consideration is that the trial court's theory of the first count, and not this Court's theory, was actually applied during the trial and determined the character of his rulings and instructions; and if the writer is correct in his interpretation of the trial court's theory and has properly estimated the effect of such theory on the conduct of the trial it is clear that the appellant was deprived of substantial

rights to which he was entitled under both the *per curiam* and individual opinions.

Since I believe the defendant's legitimate interests were prejudiced by the trial court's theory of Count 1, and the rulings and instructions based thereon, I conclude that the judgment should be reversed and a new trial granted.

MARTIN, J., DISSENTING IN PART, CONCURRING IN PART, DISSENTING IN THE CONCLUSION.

*Charges contained in the several counts.*

Count 3 of the indictment charged that appellant did:

"unlawfully and feloniously touch, beat, strike, bite and wound the body and person of the said Madge Oberholtzer with the unlawful and felonious intent then and there and thereby forcibly and against her will the said Madge Oberholtzer to ravish and carnally know, from which said assault and from which touching, biting, striking and wounding and as a result thereof the said Madge Oberholtzer did then and there sicken, languish and die," and "did unlawfully and feloniously in the manner and form and by the means aforesaid the said Madge Oberholtzer, kill and murder" . . .

Count 2 of the indictment charged that the appellant:

"did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder one Madge Oberholtzer by then and there unlawfully and purposely causing to be administered to the said Madge Oberholtzer by her own hand a certain deadly poison commonly called bichloride of mercury which the said Madge Oberholtzer acting under fear and duress and the compulsion of said David C. Stephenson, Earl Gentry and Earl Klink, did then and there swallow into her stomach and body by which she then and there thereby died."

Count 4 of the indictment charged that appellant:

"did then and there unlawfully, feloniously, purposely and with premeditated malice kill and murder one Madge Oberholtzer," and "being then and there able to provide such medical attention, services and assistance . . . did . . . unlawfully, feloniously and forcibly imprison, restrain and pre-

vent the said Madge Oberholtzer from such medical assistance and services with the unlawful and felonious intent . . . to kill and murder the said Madge Oberholtzer."

The verdict of the jury finding the appellant guilty only on the first count of the indictment amounted to a finding in his favor on the foregoing three counts.

Count one of the indictment narrated at length the facts which the state proposed to prove, following in the main the statements contained in decedent's dying declaration. (The first nine pages of the seventeen-page statement of the facts proven at the trial set out in the prevailing opinion is identical with the written dying declaration of the deceased, Madge Oberholtzer,—except that its relation of those facts are in the third person, while her narration of them is in the first person.) Count one charged "that thereafter she the said Madge Oberholtzer did . . . die from the effects of her wounds inflicted as aforesaid and said poison taken aforesaid" and concluded that appellant "did, by the manner and means aforesaid, her, the said Madge Oberholtzer, unlawfully, feloniously and with premeditated malice, kill and murder." There is no charge in this count that the acts of appellant were purposely done, it being apparent, and the state conceding, that it is not a charge of wilful murder under that portion of §347, ch. 169, Acts 1905, §2412, Burns 1926, which provides that "Whoever, purposely and with premeditated malice . . . kills any human being is guilty of murder, . . ." but is a charge under that portion of the same section which provides that "whoever . . . in the perpetration of, or attempt to perpetrate, a rape . . . or by administering poison or causing the same to be administered, kills any human being is guilty of murder."

*The two theories relied upon to sustain the conviction.*

The state in its brief, and in the oral argument which was held on April 30, 1928, sought to uphold the verdict of second degree murder and the judgment of the lower court imposing life imprisonment on two separate theories: *first* that a contributing cause of Miss Oberholtzer's death was an abcess in her lung resulting from an infection in a bite on her breast inflicted by appellant during the course of his assault upon her and *second* that the death was caused by the poison and that Stephenson was legally responsible for her having taken the poison. The prevailing *"per curiam"* opinion of the court apparently adopts the second theory, (but on the ground that the deceased was mentally irresponsible when she took the poison and that the acts of appellant were the cause of such mental irresponsibility). The *per curiam* opinion does not discuss the first theory, notwithstanding the sharp conflict between the parties with reference thereto and I assume that such theory is rejected by the court, in which action I concur. At the risk of extending this opinion beyond its proper limits I shall discuss both these theories, which are ably briefed by the parties, since the points decided in this novel case have a far-reaching effect on the criminal law as it relates to the crime of murder.[1]

*Verdict of guilty based on infliction of a bite during the perpetration of a rape could be sustained if the bite caused death (1) directly or (2) indirectly through development of infection, uneffected by intervening human action.*

The bite or wound on deceased's breast was inflicted during the perpetration, or attempt to perpetrate, a rape and if such wound caused the death directly, or if it caused the death indirectly, through a chain of natural effects and causes unchanged by human action, a ver-

*Note 1.* Some aspects of this case not treated in the opinion appear in Cornelius, Cross-Examination of Witnesses (Bobbs-Merrill 1929) which devotes chapter 27, pages 509 to 622 to the case.

dict of guilty based thereon could be sustained. *Hall* v. *State* (1928), 199 Ind. 592, 159 N. E. 420 ; *Kelly* v. *State* (1876), 53 Ind. 311. In other words, if an infection developed from the bite, which infection uneffected by any intervening human action caused decedent's death, then the bite can be considered, in law, the cause of death. In a note to *Hall* v. *State, supra,* a number of cases are collected in which this principle of law has been applied.

> *The state failed to prove that infection from the bite on deceased's breast was the cause of an abcess on her lung or infection in her kidneys.*
>
> *Even if infection from bite was the cause of such secondary infection, medical testimony that death was caused by infection "superimposed" upon poisoning must be considered in light of the fact the poison was taken subsequent to the infliction of the bite.*
>
> *The fact that deceased, by reason of the bite, may have been more susceptible to the fatal effects of the poison does not render the bite the proximate cause of death (unless the taking of the poison was the natural result of the bite).*

Dr. Kingsbury, one of the principal witnesses for the state, testified that the lacerations on deceased's left breast became infected. He was asked, "Were they infected at the time of her death?" and answered, "No they had healed, there were scars there." He was asked the nature of the infection and replied, "Oh, the ordinary pus producer, ordinarily staphylococci, sometimes—it is nearly always responsible for pus infection." The trained nurse who attended deceased testified that she sterilized the abrasions and that they healed up. The evidence shows that the bite on deceased's breast was not a serious wound calculated to destroy or endanger life, nor was the infection resulting therefrom shown by the testimony of any witness to have been serious enough, of itself, to destroy life.

It therefore can not be contended that death resulted directly from the bite, but it is contended by the state that such bite and infection is a responsible cause of death for the reason that deceased might have, or would have, recovered from the effects of the poison which she afterwards took, except for the existence of the infection from the bite. There is opinion evidence by physicians, called as expert witnesses for the state, that deceased might have, or would have, recovered from the mercurial poisoning had it not been for an infection which developed, and which may have resulted from the previously inflicted bite.

This opinion evidence must be considered in connection with the other medical evidence, not in conflict therewith, regarding the bite and the infection. The evidence of the state does not establish the fact that the abscess in the lung or the infection in the kidney discovered by a post-mortem examination was the result of infection from the bite on the breast. Dr. Warvel, witness for the state, testified: "I would not say certain that because there was an abrasion on one of the breasts and an abscess in one of the lungs that it would necessarily follow that one communicated germs to the other unless I could prove there was no other avenue of infection." It was undisputed that the deceased had recently suffered from the flu (influenza) from which such an abscess might have resulted.

Physicians as expert witnesses for the state testified that an infection could be carried from a surface wound to the lung by the blood stream; that such a process was known as septicemia or infection of the blood (blood poisoning) and results in the development of pyemia or localization of the infection; and that such a condition would be accompanied by a marked rise in the temperature of the patient and could be definitely established by a microscopic examination of the patient's blood. The

detained record of deceased's temperature from March 17 to April 14, inclusive, as given by the nurse from her records shows a gradual and not a marked rise of temperature, and although it clearly appears that the patient's blood was tested and examined, there was no testimony that the blood ever showed a condition of septicemia caused by the staphylococci infection on the breast. It thus appears that while the state proved that an abscess on the lung might or could result from an infection resulting from a bite on the breast, it did not establish as a fact that the infection of this decedent's lung was carried by her blood stream from an infected breast, nor did the state prove in the language of its own expert that "there was no other avenue of infection."

Doctors Moon, McDonald and Mertz, as expert witnesses for the state, in answer to a hypothetical question approximately eight hundred words in length, propounded by the prosecuting attorney, testified that the cause of death in such a hypothetical case was: "toxic nephritis due to mercuric chloride ingestion with a terminal . . . superadded infection,"—"an acute staphylococci infection superimposed upon an acute nephritis in the kidney," etc. Dr. Warvel, another of the state's experts, testified that in his opinion the cause of death in such hypothetical case was "some secondary complication" or infection, the nature of which he was unable to state, "superimposed upon nephritis." These expert witnesses on cross-examination stated that they had testified at a former hearing (on a petition by the defendant to be let to bail) that they then diagnosed the death of decedent to have been due to bichloride of mercury poisoning. Two of them there testified that the lacerations on the breast did not produce or were not the cause of death. One of them in reporting to the coroner the result of the autopsy stated that he found

on the lung a "localized solitary superative pulmonary lesion, possibly tuberculous."

We have pointed out that the state did not prove that the staphylococci infection referred to resulted from the bite on decedent's breast. But even if the evidence of the state could be considered as establishing the fact that death resulted, not from the poison alone, but from the effect of an infection from the bite on the breast superimposed upon the nephritis caused by the poison, then such proof would necessarily have to be considered in connection with a consideration of the facts regarding the time of the infliction of the bite and the time of the taking of the poison, in order to determine the proximate cause of deceased's death. From the viewpoint of those medical experts of the state the infection may have been "superimposed" upon the nephritis, but from the viewpoint of a court in determining the guilt or innocence of one charged with murder by infliction of a bite, (which was not in itself a dangerous wound), such bite and the infection resulting therefrom could not be "superimposed" upon the dangerous condition arising from poison which was afterwards taken, so as to make the bite and not the poison the proximate cause of the death.

The fact that deceased, by reason of the bite and its resulting infection, may have been more susceptible to the fatal effects of the poison than she otherwise would have been, does not render the poison any the less the proximate cause of the death, 2 Brill Cyc. Cr. L. 1017, and does not render the bite, which was not a serious wound, the proximate cause of the death, unless the taking of the poison was the natural result of the wound. See discussion infra.

If the state had proved that infection in the lung and kidneys resulted from the bite on the breast and that appellant inflicted the bite after the deceased took the

poison and an infection which resulted naturally from the bite then supervened or was superimposed upon the nephritis a different case would be presented for our consideration.

*Where wound is not dangerous and death results from cause subsequently arising (not at the direction of the one inflicting the first wound) the supervening cause is the proximate cause of death.*

Where a wound is inflicted by one person on another which is not in itself dangerous or necessarily fatal and death results, not from such wound directly nor from such wound indirectly "through a chain of natural effects and causes, unchanged by human action," but death results from some cause subsequently arising not at the direction or ·connivance of the one inflicting the first wound, and but for such subsequently arising cause death would not have resulted, the infliction of the first wound is not the proximate cause of death, but the supervening cause is the proximate cause and the one responsible for the death. *Bush* v. *Com., supra; Livingston* v. *Com.* (1857), 14. Grat. (Va.) 592; *Peo.* v. *Elder* (1894), 100 Mich. 155, 59 N. W. 237; *Quinn* v. *State* (1914), 106 Miss. 844, 64 So. 738; *Treadwell* v. *State, supra; Walker* v. *State* (1902), 116 Ga. 537, 42 S. E. 787, 67 L. R. A. 426; *State* v. *Johnson* (1893), 118 Mo. 491, 24 S. W. 229, 40 Am. St. Rep. 405; Notes, 16 Ann. Cas. 579; 8 A. L. R. 520.

*"Contributing" cause of death, must constitute a proximate contribution to sustain criminal responsibility.*

The state cites numerous cases as supporting its proposition that "when a cause for which one is responsible contributes to death, he is not relieved from criminal responsibility by reason of the fact that another or other causes for which he is not responsible also con-

tributed to such death," and in 29 C. J. 1079 it is said: "If an injury caused by defendant contributed to the death, defendant is responsible although a subsequent mortal wound inflicted independently by another also contributed thereto." The use of the words "contributes" and "contributed" in the foregoing statements is apt to prove confusing unless a review is made of the cases upon which the statement is based, from which review it is seen that a proximate contribution is necessary to sustain criminal responsibility. In most of the cases cited the first wound was a mortal wound and in practically all of the cases the court held that the injury inflicted by the defendant who was found guilty was the proximate cause of the death. Of the six cases cited by *Corpus Juris* five were cases where men were killed in fights as the result of joint acts of two assailants.[2]

*Unlawful act must be the proximate cause of death.*

"To render a person responsible for the death of another . . . his unlawful act or omission must be the

*Note 2.* Many of the cases cited by the state to sustain its contention last stated have no direct application to questions arising in the case at bar. *Hemblin* v. *State* (1908), 81 Neb. 148, 115 N. W. 850; *People* v. *Kane* (1915), 213 N. Y. 260, 107 N. E. 655; *Hopkins* v. *U. S.* (1894), 4 A. C. (D. C.) 430; *State* v. *Hambright* (1892), 111 N. C. 707, 16 S. E. 411; and *Odeneal* v. *State* (1913), 128 Tenn. 60, 157 S. W. 419, involve questions of the effect of unskillful or improper medical treatment, of deceased's neglect to obtain medical treatment, or to take proper care of himself, of a surgical operation made necessary by a wound and performed with reasonable skill. These questions are not involved in the case at bar, nor are the rules announced therein so directly applicable as to require discussion. See *Hall* v. *State, supra,* where, at page 607 (199 Ind.) the well known passage from Hale, Pleas of Crown, p. 428, is quoted and the rules applicable where death results from a disease caused by a wound or injury or from the treatment thereof are discussed. *State* v. *Smith* (1887), 73 Iowa 32, 34 N. W. 597; *Com.* v. *Fox* (1856), 7 Gray 586 (Mass.) and *Harvey* v. *State* (1916), 15 Ala. App. 311, 73 So. 200, cited by the state, were cases where ill and enfeebled wives died from assaults committed by their husbands; while *Fisher* v. *State* (1882), 78 Tenn. 151 (10 Lea); *Duque* v. *State* (1909), 56 Tex. Crim. 214, 119 S. W. 687; and *People v. Ah Fat* (1874), 48 Cal. 61, cited by appellee (like the list of five cases cited in Corpus Juris) involved deaths resulting from more than one injury sustained in fights participated in by several persons.

proximate cause of the death of the person killed."
2 Brill Cyc. Cr. L. 1013-1014. In *Dunville* v. *State*
(1919), 188 Ind. 373, 123 N. E. 689, in an appeal from
a conviction for manslaughter it was held that "it is
always necessary that the evidence show that the un-
lawful act is the proximate cause of the death." The
part of the manslaughter act (§2416, Burns 1926) under
which that conviction was had provides that "Whoever
unlawfully kills any human being without malice, ex-
press, or implied . . . involuntarily, but in the com-
mission of some unlawful act is guilty of manslaughter"
. . . . The part of the statute under this prosecu-
tion is based, §2412, Burns 1926, has been quoted,
*supra*, and it is likewise necessary to sustain a convic-
tion under it that the evidence show that the act of the
defendant, in the perpetration of or attempt to perpe-
trate the felony specified, is the proximate cause of the
death. In the case at bar the evidence is not sufficient
to show that the bite or the infection resulting there-
from was the proximate cause responsible for decedent's
death, but it appears that bichloride of mercury poison-
ing was the supervening, proximate and responsible
cause thereof.[3]

*Note 3.* The foregoing statement is made, based only on a con-
sideration of that evidence properly admissible to support count
one of the indictment on which the conviction was had, and disre-
garding the evidence introduced to support count four on which
there was no finding of guilty. The doctors testifying for the state
said that in their opinion the delay in securing medical attention
for deceased greatly increased the chances of fatality and tended
to shorten the life of deceased. On a re-trial (which I believe should
be ordered) the question might arise as to whether the mercurial
poisoning or the delay in furnishing medical attention constitutes
the proximate cause of the death, but such question is not before
us on this appeal. (The granting of a new trial would return
this cause to the lower court for a trial *de novo* on all counts of the
indictment, the same "as if no trial had been had," §2324 Burns
1926; *Veatch* v. *State* (1878), 60 Ind. 291, 295; *State* v. *Balsley*
(1902), 159 Ind. 395, 65 N. E. 185; *Ex Parte Bradley* (1874), 48
Ind. 548.)

*Responsibility for deceased's having taken poison.*

While the state maintains that the wound inflicted during the attempted rape and the infection resulting therefrom was the cause of death and that appellant was guilty of murder by reason thereof "even though the poison as a concurrent cause of death were taken by her without legal responsibility therefor by appellant;" yet it also contends that appellant is guilty of murder for the reason that he is legally responsible for deceased's having taken the poison.

It is unnecessary to consider here the much mooted question as to whether suicide is a crime, or to consider the criminal liability of one who advises or aids another to commit suicide (see 37 Cyc. 521). Our statute, as already noted, provides that "Whoever . . . by 'administering' poison or 'causing the same to be administered,' kills any human being is guilty of murder." (See *People* v. *Roberts* (1920), 211 Mich. 178, 178 N. W. 690, 13 A. L. R. 1253.) There was no evidence that appellant "administered" the poison or "caused the same to be administered" to deceased, or that at the time the deceased took the poison she was under any restraint or compulsion by appellant, which would cause her act to be considered in law the act of the appellant.

Where, upon deliberation, one commits suicide because of shame, humiliation or remorse, the one who caused such mental state,—although he may be morally responsible for the death in the sight of God,—is not guilty of murder under the law, unless he in some way procured, advised, compelled, assisted or exercised control over the person performing the act. (See 1 Hale, Pleas of Crown 429; 1 East P. C. ch. 5, §13; *Com.* v. *Webster* (1850), 5 Cush. 295 [Mass.] 52 Am. Dec. 411; *Reg.* v. *Murton* [1862], 3 F. & F. 492.)

It is said that the rule of the early common law that a homicide to be criminal must have resulted from cor-

poreal injury, (see 29 C. J. 1080) has been gradually modified and greatly relaxed in modern times, and that fright, fear, nervous shock or producing mental disturbances can now be made the basis of a prosecution for homicide. 13 R. C. L. 846. This may be true in a proper case but I do not believe that such a case has been made out here, nor can I follow the reasoning (nor in view of *Potter* v. *State* (1904), 162 Ind. 213, 70 N. E. 129, 102 A. S. R. 198, 1 Ann. Cas, 32, 64 L. R. A. 942, can we approve the holding) of the case usually cited to sustain the statement made in R. C. L. *supra,* viz: *In re Heigo* (1910), 18 Idaho 366, 110 Pac. 1029, Ann. Cas. 1912A, 138 32 L. R. A. (N. S.) 877, (which case held that where a bystander observed an altercation between two men, one of whom was armed, and died as the result of fright, terror and nervous shock, the man who was armed was guilty of manslaughter under an Idaho statute defining the crime).

There is no charge in count one of the indictment, under which the conviction was had, (as there is in count two) that deceased took the poison "acting under fear and duress and the compulsion of said D. C. Stephenson," but the charge in count one is that deceased "distracted with pain and shame so inflicted upon her by said defendants . . . did procure and swallow into her stomach a large quantity of deadly poison, to wit, bichloride of mercury." We must presume from the fact that the jury made no finding of guilty under count two that it did not consider the evidence sufficient to show that deceased destroyed her life under a well-grounded apprehension of immediate violence or injury from appellant so as to make her act "the act of him who compelled the deceased to take the step." *Regina* v. *Pitts* (1842), 1 Carrington & Marshmans 284; *Hendrickson* v. *Com.* (1887), 85 Ky. 281, 3 S.W. 166, 7 Am. St. Rep. 596; *State* v. *Shelledy* (1859), 8 Iowa 477, 506.

See also *Rex* v. *Valade,* (Que.) 22 Rev. de Jur. 524, 26 Can. Cr. Cas. 233; *Norman* v. *United States* (1902), 20 App. D. C. 494; and other cases cited infra.

### *Taking of poison as a natural consequence of the rape, attempted rape or bite.*

Only one argument by which the state sought to sustain the verdict of guilty under the first count of the indictment remains for consideration, viz.: that one who inflicts a wound is held to contemplate and be responsible for the natural consequence of his act, and that at the time appellant committed the rape or the attempted rape, he was bound to anticipate deceased's act of taking bichloride of mercury. I do not find any evidence to justify a finding that the taking of poison by deceased was such an act as a reasonable person under similar circumstances would have committed, *Henderson* v. *State* (1913), 11 Ala. App. 37, 65 So. 721; *State* v. *Preslar* (1856), 48 N. C. 421; *Reg.* v. *Donovan* (1850), 4 Cox 397; *Gipe* v. *State* (1905), 165 Ind. 433, 75 N. E. 881, 1 L. R. A. (N. S.) 419, 112 Am. St. Rep. 238, or was a natural consequence of the rape (or attempted rape or the bite made during the same) which the appellant was bound by law to contemplate. *Quinn* v. *State, supra; Treadwell* v. *State, supra; Bush* v. *Com., supra; Livingston* v. *Com., supra;* Note 8 A. L. R. 520. The facts in this case do not bring it within the rule laid down in the cases where the direct cause of death was an act of the deceased reasonably due to defendant's unlawful conduct such as *Rex* v. *Valade, supra,* where the accused induced a young girl under the age of consent to go alone with him to a secluded apartment and there had criminal sexual intercourse with her, following which she jumped from a window to the street to get away from him and was killed by the fall; *Norman* v. *United States* (1902), 20 App. D. C. 494, where death was

caused by falling into a canal while attempting to escape from violent assault; *Hendrickson* v. *Com., supra;* where accused used such force and violence as to cause his wife from fear of death or great bodily harm to leave the house on a cold night whereby she died of exposure. See also *Thornton* v. *State* (1899), 107 Ga. 683, 33 S. E. 673; *Adams* v. *People* (1886), 109 Ill. 444, 50 Am. Rep. 617; *State* v. *Preslar, supra.*

After a consideration of all the foregoing propositions by the court, the *per curiam* opinion was adopted which holds that the allegation in the indictment that Miss Oberholtzer was "distracted with pain and shame" when she took bichloride of mercury was sufficient to charge that she was mentally irresponsible when she took the poison; and that the evidence was sufficient to show the infliction of physical and mental injuries which rendered the deceased mentally irresponsible at the time of her "suicide." I do not believe the adjective clause in the indictment "distracted with pain and shame" is equivalent to a charge that the deceased was of unsound mind or was mentally unbalanced. Charges in an indictment must be clear and plain and if the grand jury had intended to make a charge that the appellant had by his acts caused Madge Oberholtzer to become mentally unbalanced and of unsound mind they would have done so by a definite and certain charge to that effect.

The trial was not had on any such theory and there is no evidence to indicate that at any time the mind of the deceased was not clear and sound. We cannot assume otherwise without proof. (An assumption that every person who commits suicide is insane as well as an unqualified holding that one who mistreats another so as to cause insanity is responsible for the criminal acts thereafter committed by such person, would lead to most dangerous legal consequences). There was no

expert testimony to the effect that Miss Oberholtzer was at any time mentally irresponsible and her own very carefully prepared "dying declaration" does not state nor does it indicate any unsoundness of mind at the time she took the poison.  On the contrary such declaration minutely describes her mental processes and narrates and describes the events with great particularity —even to detailing the menu of Stephenson's breakfast. It appears very clearly from her statement that she committed suicide because of "shame, humiliation or remorse."  She expressly stated that she decided to take her life "in order to save my mother from disgrace," and that she wanted to kill herself "in Stephenson's presence."  The evidence shows she was not accompanied by Stephenson, Klinck or "Shorty," the chauffeur, or under their control when she was in the store where she purchased the hat or in the drug store where she purchased the poison, and that she returned without any compulsion to their rooms at the hotel where she took the poison.

I do not believe that the evidence is sufficient to sustain a finding of guilty under the first count of the indictment and for that reason (as well as other reasons hereinafter stated) believe that the judgment should be reversed with directions to grant appellant a new trial.

### Conferring of jurisdiction upon change of venue.

I agree with the conclusion reached by the *per curiam* opinion on the question as to whether the Hamilton Circuit Court had jurisdiction of the cause, the person and the subject-matter in this prosecution.  Appellant's contention is that jurisdiction over the cause and over his person could only be gained by the Hamilton Circuit Court by the depositing in that court of a transcript of the proceedings had in the criminal court of Marion county, duly authenticated by the signature of the clerk

and by the seal of said criminal court; that the signature of the clerk to the certificate of the transcript was omitted and does not appear in the transcript, and that therefore there was in fact no transcript at all and that the Hamilton Circuit Court did not acquire any jurisdiction. Appellant does not contend that the criminal court of Marion County did not grant the change of venue and order the case sent to Hamilton County for trial, nor does he contend that the transcript of the record transferred to the Hamilton Circuit Court was incorrect in any particular. The transcript was complete and in proper form, except for the signature of the clerk of the certificate.

Jurisdiction over a defendant is not conferred upon the court to which a change of venue is taken by the signature on the certificate to the transcript of the clerk of the court in which the case was pending before the change, but it is conferred by the order of the court which grants the change and directs where the cause is sent for trial. The change of venue and of jurisdiction is not completed until the requirements of the statute are met, with respect to the depositing of the transcript in the office of the clerk of the court to which the change is granted (§2239, 2240, Burns 1926) but where a transcript, regular in form and sealed with the seal of the court, is deposited in the court to which the cause is sent, the jurisdiction of that court attaches and the lack of the signature of the clerk of the other court, in the absence of any attack on the authenticity of the transcript, will be deemed a technical informality which might have been amended in the trial court, and which renders the transcript defective but not void. A proper certification and attestation for a transcript is the signature of the clerk and the affixing of the seal of the court, but the absence of such signature of the clerk to the certificate could have been easily cured and

it does not appear that such defect in any way prejudiced any of the appellant's rights.

The appellant did not raise any jurisdictional question in the Hamilton Circuit Court, but acquiesced in the jurisdiction exercised by it and proceeded to trial therein. Appellant points out that no acts on the part of the defendant in a criminal case involving the deprivation of life or liberty can serve to waive that which the law makes essential, or that which the statute prescribes as necessary in order that the court may acquire jurisdiction, but it is also well settled that a party, by asking for a change of venue and appearing to the action in the court to which it is removed, waives his right to complain of any mere irregularity in the matter of the change. The Hamilton Circuit Court properly exercised jurisdiction in this case.

This appellant, in an application to the LaPorte Circuit Court for a writ of habeas corpus for release from the Indiana State prison, presented the same question in this regard that is here decided. That court denied his application and upon appeal to this court its judgment was affirmed. *Stephenson* v. *Daly* (1927), 200 Ind. 196, at 202. (See syllabus points 10, 11 and 12), 158 N. E. 289.

### *Admissibility of dying declarations.*

The principal questions in this case upon the admissibility of evidence arose upon the admission of the written dying declaration of deceased, and the testimony of a doctor to whom deceased made oral statements to the same effect as those contained in the written dying declaration. The law concerning the admission in evidence of dying declarations has been discussed in this appeal as exhaustively perhaps as in any case that has ever been before it. I therefore deem it important to state somewhat more fully than has been

done in the *per curiam* opinion the questions involved and the law relating therto. I concur in the decision reached by the court as to the admissibility of the written dying declaration, but believe that the testimony of the doctor was admitted without the necessary foundation being laid therefor.

## Deceased's written dying declaration.

The written dying declaration of the deceased consisted of more than three thousand words. It was signed by her on March 28, ten days after her trip to Hammond and seventeen days before her death. It appears from the evidence that just before it was read to and signed by her, her physician for the first time advised her that she was going to die. He told her that she had no chance for recovery; that she was going to die, and told her why—that the blood test that afternoon showed a worse condition and that her condition was unfavorable and that he wanted her to understand it. He gave as reasons to her that she could not recover that her kidneys were broken down and destroyed from the poison and that poison had made such a spread in her system that she could not recover. She said, "Doctor . . . I understand you, I believe you and I am ready to die." This, together with other evidence which is in the rcord of her statements, and of her physical condition as a result of the poison, meets the two essential requirements for an admissible dying declaration hereinbefore stated, viz.: that the declarant shall be in extremis and shall have abandoned hope of recovery and be under a firm conviction that death is inevitable and near at hand.

The dying declaration was prepared for the deceased's signature by Mr. Asa J. Smith, an attorney and friend of the Oberholtzer family, and others who were assisting him. Mr. Smith went to the Oberholtzer

home and saw deceased on the afternoon of the day she returned home. At the request of deceased's mother he had helped to search for her on the previous night, March 16, (after her departure from home on the night of March 15 and the receipt by her mother of a telegram from her dated at Hammond) and had gone with the mother to appellant's home during the search. He was employed by the deceased's father to bring a civil suit against appellant, or "do whatever was necessary in the matter." Mr. Smith visited deceased practically every day from March 17, to March 28. Three or four days before March 28 he began the preparation of the dying declaration. He made notes from memory of what deceased at different times had told him of the events which occurred on her trip to Hammond and reduced the same to writing in his law office. Miss Ermina Moore, an intimate friend of deceased, on March 26, took to Mr. Smith's office notes which she had made, and they also were incorporated by him into the written statement. He selected the words and built up the phrases to make what he thought was the substance of what deceased had told him. This he read over and corrected and then in the presence of Miss Moore and Mr. Griffith D. Dean, his law-office associate, he dictated to a stenographer, from what he had written, the entire statement. Two days later (March 28) Mr. Smith and Miss Moore went through this draft of the statement and again corrected it. Then Mr. Smith again rewrote a part of it in longhand, then redictated to the stenographer the entire statement, except the pages he had rewritten. About 6 P. M. the same day at deceased's bedside, with Mr. Dean, Miss Moore and Dr. Kingsbury also present, Mr. Smith read the statement to deceased very slowly and distinctly. He stopped in the course of the reading after each sentence for her affirmance or denial, and made some corrections which

she desired. As he proceeded with his reading he asked deceased if she understood it and if it was correct and she said "I do understand it . . . it is correct," except at certain times she said things were not correct and Mr. Smith made, in ink, the changes she desired. He showed her the place to sign and told her if it was true she could sign it and she said "I will sign it" and did so.

The exception to the rule against hearsay evidence which permits the introduction and consideration in felonious homicide cases of dying declarations was introduced into the law less than two hundred years ago as matter of the fullest necessity or public policy to detect and punish those guilty of crime since by their crime, usually committed in secret, offenders may still the tongues of the only persons in the world who could affirm their guilt. The reasons against admitting such evidence (that they do not [usually] bear the sanction of an oath, are not subject to the test of cross-examination, eliminate the right of the accused to confront the witness, are subject to misconstruction by auditors or amanuensis who are ignorant, inattentive or criminally motivated, that they may permit a conviction on the statement of one whose body is weakened and whose mind may be disordered by the panic of momentary death and who may harbor malice and vindictiveness) —were only put aside on the theory that the immediate approach of death, under the sanction of a moral sense of certain and just retribution, silences every motive to falsehood and by the most powerful considerations induces the mind to speak the truth, creates a situation so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge or any conceivable motive to misrepresent and amounts to an obligation equal to that imposed by a solemn oath in a court of justice. See cases collected in Note, 56 L. R. A. 353.

It was not shown nor was it necessary to show that deceased was under a firm conviction of impending death at the time she held the conversations with the attorney from which he constructed the statement for it does appear that at the time she adopted and signed the statement as her dying declaration she had abandoned hope of recovery and had a firm conviction of impending death. 30 C. J. 257. The fact that the declaration was prepared by a lawyer who was interested in a civil action against appellant should render such a declaration subject to the closest scrutiny but we can not say that the declaration was rendered inadmissible by the fact that he prepared it. In the absence of any evidence of improper conduct on the part of the attorney such objection to the dying declaration would not go to its admissibility, but to its weight, which is solely a question for the jury. 1 R. C. L. 547. In *Harper* v. *State* (1902) 79 Miss. 575, 31 So. 195, 56 L. R. A. 372, a dying declaration was held to have been erroneously admitted, the court (after doubting the authenticity of the declaration) holding that there was no sufficient evidence of a solemn sense of impending dissolution when the deceased signed the statement. The statement had been prepared by deceased's attorney, who feared a fatal result might ensue, to be signed by the patient whenever he came to think he would die. The court said: "Moreover, we think a declaration prepared by a person in full possession of his mental faculties and in confident hope of recovery, to be signed in the possible event of a subsequent conviction of a fatal termination is too much tainted to be admissible in evidence." This dicta is not applicable to the facts here nor do we approve it unqualifiedly as a correct statement of law.

Appellant's objection to the admission of state's exhibit No. 1 (the dying declaration) was addressed

"separately and severally as to each word, phrase, sentence, paragraph, part, conclusion and opinion" and stated at length his objection to the declaration as a whole (that the corpus delicti had not been established independently of the declaration, that the declaration is one of suicide, that it shows that death was not the proximate result of defendant's acts, that it was made nineteen days before death and when deceased was not *in extremis* and when she had not abandoned hope and was not under a sense of impending dissolution, that no causal connection was shown between the defendant's act and her death, that it is a recital of past events and the conclusions and opinions of the declarant and is not limited to declarations to identify defendant with the circumstances producing and attending death). The objection was sufficient to raise the general questions concerning the declaration as a whole which we have already discussed, but it was not sufficient as an objection to specific parts of the declaration. An objection generally to "every word, phrase, sentence," etc., does not point out to the court with sufficient certainty the part or parts of the statement which the party deems objectionable.

The court properly struck out of the statement sentences telling of deceased being "impressed with Stephenson's power and influence," of her being "attracted by his apparent influence and power with the state officials and his general political influence," of what he said to her at dances, and what he said when he drove her to her home "while the legislature was in session," because it is not permissible to show by a dying declaration matters occuring anterior to and not immediately connected with the homicide, nor to show the conduct of the parties at another time nor to show the opinions and mental conclusions of the deceased. *Montgomery* v. *State* (1881), 80 Ind. 338, 41 Am. Rep. 815;

*Binns* v. *State* (1874), 46 Ind. 311; *Jones* v. *State* (1880), 71 Ind. 66. For the same reason the court, if proper objections had been made, should have struck out of the statement—those sentences stating that deceased "first met David C. Stephenson at the banquet given for the Governor at the Athletic Club early in January, 1925," telling of her various dinner engagements with appellant at a hotel, and of a party at his home "with several prominent people."

Appellant points out specifically in his brief numerous statements in the dying declaration which he says are merely "conclusions, opinions and recitals of mental operations of deceased." A mere conclusion or expression of opinion or belief by a dying person is not admissible as a dying declaration, *Boyle* v. *State* (1886), 105 Ind. 469, 5 N. E. 203, 55 Am. Rep. 218; *Montgomery* v. *State, supra; Binns* v. *State, supra*, but where a dying declaration contains unimportant expressions of opinion or conclusions such as a number of those statements here objected to are, and which taken in connection with the entire declaration are not prejudicial, their admission is not error. *Cleveland* v. *Com.* (1907), 31 Ky. Law Rep. 115, 101 S. W. 931.

Dying declarations are limited to a recital of facts connected with the *res gestae* of the alleged crime. Under the several counts of the indictment under which appellant was tried the alleged criminal act was murder in the perpetration of or attempt to perpetrate a rape, in the administering of poison and by restraining and preventing medical assistance and services, hence the rather wide scope of the dying declaration here was not improper.

### Deceased's oral statements to physician.

The doctor, John F. Kingsbury, after stating his residence, age, and professional training testified that he

was called by telephone at 11:30 A. M. March 17, and went immediately to the Oberholtzer home; that he found Miss Madge Oberholtzer lying on a bed in a state of shock, pale and cold and with a rapid pulse; that she was dressed in clothing in a disheveled state, her dress being open in the front exposing bruises on her chest, and that he made a superficial examination through her clothing to determine possible broken bones (having been informed that she had been injured in an automobile accident). He was then asked if in the course of his examination she said anything in reference to whether or not she expected to die, and what it was. He replied (over objection) that "she said she didn't expect to get well, didn't want to get well, that she wanted to die." He was then asked: "Now doctor, just detail any conversation which you may have had with her concerning her condition?" He replied: "I asked her how badly she was hurt; she said she didn't know. I then made a hasty examination of her, found no bones broken and told her I found none, and I asked her how it happened. She said: 'When I get better I will tell you the whole story.' Because of her state of shock, and being thrown in on to that condition without preparation, I didn't know how severely she was hurt or injured and pressed her for a reply to my question, she then said . . ." At this point appellant again interposed an objection including the ground that it had not been shown that deceased was in extremis, or that she thought she was going to die soon, which objection was overruled. The doctor then proceeded to relate in an answer that occupies 145 lines of the typewritten record a narration, as told to him by Miss Oberholtzer, of all the events occuring from before the time she left home until she returned.

The only other evidence which had been adduced, up to the time Dr. Kingsbury testified, that would bear on

the admissibility of deceased's statement to the doctor as a dying declaration was that given by Mrs. Eunice Schultz, who was a roomer at the Oberholtzer home. She testified that the man who brought Madge home told her that "She was hurt in an automobile accident . . . he said he did not think any bones were broken" that she saw the bruises on various parts of Madge's body which she described. In reply to the following question by the state: "Now Mrs. Schultz what, if anything, did Madge say to you when you came in the room?" Mrs. Schultz testified "She said 'Oh I am dying Mrs. Schultz' . . ." The witness further testified that Madge "groaned 'Oh' and 'Dear Mother' " and told her to call a physician.

The conditions essential for the admission in evidence, as an exception to the hearsay rule, of unsworn statements of a dying person regarding the circumstances of the homicide in the trial of one accused thereof are (1) that the person making the dying declaration must be in extremis, *i. e.* beyond hope of recovery, and (2) that such person must have abandoned all hope of recovery from the injury alleged to have been inflicted by the accused and be under a firm conviction that his death is inevitable and is near at hand. *McKee* v. *State* (1926) 198 Ind. 590, 154 N. E. 372; *Morgan* v. *State* (1869) 31 Ind. 193; *Watson* v. *State* (1878), 63 Ind. 548; *Jones* v. *State* (1880), 71 Ind. 66; *Archibald* v. *State* (1890), 122 Ind. 122, 23 N. E. 758; *Gipe* v. *State* (1905), 165 Ind. 433, 75 N. E. 881, 1 L. R. A. (N. S.) 419, 112 A. S. R. 238; *Williams* v. *State* (1907), 168 Ind. 87, 79 N. E. 1079. These conditions were not proven to have existed at the time the deceased made the statements to the physician which were here admitted in evidence. There was no testimony that at that time there was no hope of deceased's recovery or that she was near death. Deceased stated that she didn't know how badly

she was hurt and the doctor testified that at that time he did not know how severely she was hurt or injured. Regarding deceased's mental attitude toward her condition, she told the doctor that she didn't expect to get well, and said to Mrs. Schultz "I am dying," yet she had Mrs. Schultz send for the doctor and said to the doctor "When I get better I'll tell you the whole story."

Contradictory statements as to expectation of impending death have been held to prevent the admission of a statement as a dying declaration, 30 J. C. 266, citing, *Bilton* v. *Terr.* (1909), 1 Okl. Cr. 566, 99 Pac. 163.

The appellee contends that the words last above quoted "could not have been meant literally," that deceased spoke the words to avoid further questioning by the doctor, and that regardless of such words the deceased at that time was under a firm conviction of impending death. It is possible that even where a declarant expressed an opinion that he would recover, the circumstances may show that such was not his real belief. 30 C. J. 266. Also the fact that a declarant said he would not recover or would die does not show that he was without hope and expected a speedy dissolution; his statements in this regard also my be overcome by the surrounding circumstances. 30 C. J. 265, 266; *Morgan* v. *State, supra.*

Prior to the introduction in evidence of the testimony of Dr. Kingsbury regarding what deceased told him there had been no evidence received showing wounds or injuries so serious or illness so critical, that an inference would necessarily arise that the declarant was under a pending sense of dissolution (see *Gipe* v. *State, supra; McKee* v. *State, supra.*) The only witnesses who had testified were the mother of deceased and Mrs. Schultz, and no circumstances had been detailed in evidence which would serve to meet the conditions stated

above under which the statements of deceased to Dr. Kingsbury would be admissible as dying declarations of Madge Oberholtzer.

It may be noted further that at the time Dr. Kingsbury testified concerning what deceased told him, no proof had been offered by the state to show that Madge Oberholtzer died, or the date when she died. (The only thing in evidence, at that time, in which her death was referred to, even indirectly, was a question to Matilda Oberholtzer "What relation did you sustain to Madge Oberholtzer during her lifetime?" which was answered "I am her mother"). The death did not occur until about a month later than the conversation detailed by Dr. Kingsbury. While the admissibility of such evidence does not depend upon the length of the interval between the declaration and the death, *Jones* v. *State* (1880), 71 Ind. 66, 73, 74; Wigmore, Evidence (2d. Ed.) §1441, yet such length of time is a proper element to be considered in determining whether the declarations were made under a sense of impending death. *State* v. *Calvin* (1910), 226 Mo. 446, 126 S. W. 448; *State* v. *Schmidt* (1887), 73 Iowa 469, 35 N. W. 590.

*Statement made by the court to the jury.*

I can not concur in the holding of the *per curiam* opinion regarding the remarks of the trial judge in ruling on the admissibility of evidence (Appellant's 16th point). This court disapproves the practice of such discussion by the trial court in the presence of the jury, but by affirming the judgment holds that such remarks were not reversible error.

The state in examining, as a witness, the father of the deceased asked him to relate what deceased told him had happened on her trip to Hammond. An objection was made by appellant on several grounds stated, the principal one being that a proper foundation for its

introduction as a dying declaration had not been laid. Thereupon, in the presence of the jury and over the objection of the appellant, the court made the following statement:

"On the question of dying declarations, gentlemen, this is the court's view: I think I can explain that. The dying declaration may be based on conditions rather than statements; I mean, not rather than statements but as well as statements. She may make a statement to the effect that she does not think she is going to get well, she is sure she is going to die; that would form the basis of a dying declaration. It has also been held that if her condition is such that she must know that she can't get well, then that is sufficient upon which to base a dying declaration, even though she might not utter a word about that condition. The counsel stated, perhaps unthoughtedly, because he did state she more than once said to him that she did not think she would get well, she made it the first time and at the time he tried to encourage her, this language was, "Daddy, I can't get well"; she made that several times. Now the question is not provable only in murder cases that is true, but the theory is that, while it is not sufficient in a case of suicide, but this comes perhaps a little nearer by the line, along this line. In England there are crimes for persons to commit suicide, but here is the situation: it is not a question we are trying of suicide, but the complaint proceeds that murder has been committed indirectly by causing the suicide, now the question it, whether that can be done, and I am letting this go to the jury for the purpose because I think it can. Here is the situation, suppose it is suicide, this is for the jury, I am not deciding the question but that is the reason I am ruling on the evidence. Suppose—and I am not saying anything about what kind of a lady Miss Oberholtzer was, but suppose she was a virtuous woman, suppose anybody, I don't take her case, suppose any woman was a virtuous woman and she was attacked for the purpose of committing rape, if that be true, assuming that, not as being true, but just for the purpose of the argument. She might be confronted with this condition, I have

either got a chance to lose my virtue or life, suppose her virtue was dearer to her than her life, suppose that was true, would the law say to her, no, you can't take your life, you must submit your virtue. The question is, must these men anticipate this suicide as a reasonable result of their acts. Suppose I attack a virtuous woman, what must I presume? Will the law allow me to presume she does not attach greater value to her virtue than her life; will the law say that I am not presumed to indulge this presumption that she would take her life because she regards her virtue more than her life; will the law say that? I think that is the thing for the jury. The question is, am I presumed she would stake her virtue or presumed she will take her life if a virtuous woman: That is for the jury to determine; if they determine that is a reasonable thing for her to do, then I have committed murder, if it is unreasonable, I have not; if the law says to the man who has attacked a virtuous woman,—I am not saying that is the condition here, but I am saying it on a supposed case, but in passing on the evidence and giving a reason, and I do this once for all. If the law charges me under such condition, I attack a real virtuous woman I am presumed to intend the natural consequences of my acts; now what are the natural consequences? I might place a virtuous woman where she would have to say, I stand every chance of losing my virtue or losing my life; must I presume that woman—am I allowed to presume that woman regards her life dearer than her virtue; on the other hand, must I anticipate that she regards her virtue dearer than her life? If that is the fact, that is a fact for the jury to determine; then I must anticipate this woman is liable to kill herself, and if that is the natural consequence of the act that I have done, then it is for the jury to determine, and if it considered it a natural consequence, then this evidence is admissible."

Appellant's objection to the statement made by the court in the presence of the jury was overruled, as was his motion to set aside the submission and discharge the jury on account of the making of such statement. Ap-

pellant's counsel then asked leave to discuss with the court the law on the questions involved, which the court declined to hear and then made the following further statement:

> "I would not want the attorneys to think the court had not carefully considered, and I would not want them to say I have not; I don't say I am right but that is my opinion; I would not shoot off that way unless I had given it thought, and I don't suppose the counsel means to intimate, but we will take that up, gentlemen, and discuss it later."

The question to be decided by the trial court was whether it should sustain or overrule the objections made by defendant's counsel. The ruling of the court could easily have been announced in two words, yet the court used 700 words. Stating aloud to the jury the long series of mental processes by which the court reached its conclusion could serve no useful purpose. Instructions to juries at the proper time and in an orderly manner are provided for by law, and it highly improper for a court to make a long discourse in the presence of the jury on the law or the theory of the case, which can be, and doubtless was in this case, accepted by the jury as an instruction. If the judge desired to expound to counsel his view of the law involved he should have done it out of the presence of the jury. It would have been proper for him, in the absence of the jury, to have listened to argument by counsel on the question involved. In its remarks, the court assumed certain situations of fact to exist which were not alleged in the indictment nor shown to exist by evidence in the case; it made uncertain and incomplete statements regarding certain theories and rules of law which were of doubtful application to the case at bar, and I believe that such remarks were prejudicial to appellant's rights.

*Scope of cross-examination of interested witness.*

The attorney who prepared the deceased's written dying declaration testified that he had gone, with deceased's mother, to appellant's house hunting for her on the night the party returned from Hammond and that he had gone to deceased's home practically every day from March 17 to 28, during which time he wrote, corrected and rewrote the dying declaration. On cross-examination he testified that he had been employed by deceased's father to collect money from appellant or to do whatever was necessary, but the state's objections were sustained to questions asking him whether he had prepared a complaint in the case and whether he had gone to see appellant at his office about a settlement of the case. A defendant has the right to fully cross-examine the witnesses against him and to test thereby their credibility or show their interest, bias or prejudice against him. *Bedgood* v. *State* (1889), 115 Ind. 275, 281, 17 N. E. 621; *Hyland* v. *Milner* (1885), 99 Ind. 308, 311; *Kinsman* v. *State* (1881), 77 Ind. 132, 137. I believe it would have been proper to have permitted the questions asked to be answered, but by the evidence adduced in response to questions which the court did not permit to be answered, the nature of the attorney's employment and his interest appeared and we can not say that the trial court abused its discretion in limiting as it did the scope of the cross-examination. *Foust* v. *State* (1928), 200 Ind. 76, 161 N. E. 371.

*Inapplicable instructions.*

Instruction number 45 given by the court of its own motion read as follows:

"The law declares that one who inflicts an injury on another and thereby accelerates his death shall be held criminally responsible therefor, although the death would not have resulted from the injury,

but for the diseased and wounded condition of the person so injured, already existing at the time of such act of acceleration."

This instruction is selected as one of several which are not applicable to the evidence. The giving of such inapplicable instructions could only tend to mislead and confuse the jury. I can not agree that the court was justified in giving instruction 45 upon the theory that under counts 2 and 4 appellant is charged with willful murder by poison and that the act of acceleration referred to in the instruction was the poison.

I am in accord with all the statements made in the separate opinion of Treanor, J. which do not conflict with the views expressed herein.